#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BLACK & DAVISON, JAN G. SULCOVE, ESQUIRE, ROBERT C. SCHOLLAERT, ESQUIRE, ELLIOTT B. SULCOVE, ESQUIRE, JERROLD A. SULCOVE, ESQUIRE, MARK T. ORNDORF, ESQUIRE,<br><br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>CHAMBERSBURG AREA SCHOOL DISTRICT, DANA BAKER, WILLIAM LENNARTZ, CARL BARTON, EDWARD NORCROSS, JOAN SMITH, ROBERT FLOYD, MARK SCHUR, KEVIN MINTZ, ALEXANDER SHARPE,<br><br>　　　　　　　Defendants. | CIVIL ACTION<br><br>NO. 1:17-CV-00688-CCC<br><br>(BEFORE THE HONORABLE CHIEF JUDGE CHRISTOPHER C. CONNER) |

#### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, by and through their counsel, Fowler Hirtzel McNulty & Spaulding, LLP, respectfully file this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and state as follows:

**I.  Procedural History**

1. This matter arises from the alleged violation of Plaintiffs' constitutional rights based on their release as District Solicitor for the Chambersburg Area School District for reasons allegedly related to Plaintiffs' political affiliation. See generally ECF 24.

2. On April 18, 2018, Plaintiffs filed an Amended Complaint (ECF No. 24) reflecting the Court's decision to dismiss certain causes of action and a defendant (the School District's Superintendent, Dr. Joseph Padasak), named in Plaintiffs' initial Complaint and the Court's

decision to provide Plaintiffs an opportunity to assert a claim in quantum meruit See ECF Nos. 22 & 23.

3. After ruling on a second Motion to Dismiss filed by Defendants, where the Court dismissed Plaintiffs' quantum meruit claim (ECF 46 & 47), the Court then extended the fact discovery deadline to April 30, 2019. See ECF 50.

4. Pursuant to the Court's rulings on Defendants' Motions to Dismiss, Plaintiffs' remaining claims against Defendants are First Amendment violation claims asserting that Plaintiffs' constitutional rights were violated when they were released from their role as Solicitor for the Chambersburg Area School District allegedly as a result of their support for a local rival political faction ("CVEE") during the 2015 School Board primary election. See generally ECF 24.

5. With fact discovery now being complete, the matter is currently ripe for Summary Judgment determination and the instant Motion was originally submitted in conformity with the Court's May 31, 2019, dispositive motion deadline.[1]

6. As will be set forth more fully within Defendants' Brief in Support of the instant motion, the evidence adduced throughout discovery establishes that there are no genuine issues of material fact regarding the viability of the First Amendment violations alleged by Plaintiffs.

7. Defendants are entitled to judgment as a matter of law because the evidence has unequivocally established that Plaintiffs' discharge did not violate a constitutionally protected right under the circumstances.

---

[1] This Motion, as well as, the separate Statement of Facts pursuant to Local Rule 56.1, and the supporting brief are being submitted in conformity with the Court's June 5, 2019, Order.

{W0930416.1}                                2

## II.     Legal Standards

### a.  Summary Judgment

8.      Federal Rule of Civil Procedure 56 allows a District Court to enter summary judgment upon motion if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

9.      The general standard for summary judgment has been set forth, as follows:

> Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A factual dispute is material if it might affect the outcome of the suit under the applicable law. A factual dispute is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. The evidence presented must be viewed in the light most favorable to the non-moving party. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.

DeWees v. Haste, 620 F. Supp. 2d 625, 629 (M.D. Pa. 2009) (internal quotations, quotation marks, and citations omitted), *aff'd*, 386 F. App'x 133 (3d Cir. 2010).

### b.     Affidavits & Summary Judgment

10.     When considering affidavits in the context of summary judgment, the Third Circuit has posited that the term "'genuine issue,' rather than any issue of fact" demonstrates the necessity to scrutinize affidavits as "a means of sorting the wheat from the chaff." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d. Cir. 2007).

11.     This scrutiny of affidavits, commonly referred to as the "Sham Affidavit Doctrine" defines a "sham" affidavit as "a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story *or is willing to offer a statement solely for the purpose of defeating summary judgment*." Id. (emphasis added).

12. Part of the rationale for an increased scrutiny of affidavits in the context of summary judgment is that affiants and their affidavits are not subjected to cross-examination as one would be during a deposition, and hence, do not carry the increased level of reliability that is a natural byproduct of the deposition/cross-examination process. Id.

13. When it is clear that "an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." Jiminez, 503 F.3d at 253; See also EBC, Inc. v. Clark Bldg. Sys., 618 F.3d 253, 269 (3d. Cir. 2010); Doherty v. Allstate Indem. Co., 734 Fed. Appx. 817, 823 (3d. Cir. 2018).

**III.   Legal Arguments**

   **a. Defendants are entitled to Summary Judgment because there are no genuine issues of material fact regarding whether Plaintiffs were released from their role as District Solicitor for impermissible reasons.**

14. Fact discovery has shown that there are no genuine issues of material fact on whether Plaintiffs' were relieved of their position as District Solicitor because of their political activities/affiliation in the 2015 election.

15. Within their amended complaint, Plaintiffs allege that they were released from their role as District Solicitor due to their support of the CVEE faction, and thus, their First Amendment rights were infringed upon. See ECF No. 24, ¶¶ 47, 71, 72, 75, 76.

16. Despite claiming that the desire to save money on wasteful spending was "pretext" for Plaintiffs' release, Plaintiff Jan Sulcove's acknowledges the movement to change the overall direction of the School District was based upon wasteful spending and began years before the 2015 primary election. See Exhibit A, pgs. 41, 44.

17. In addition to the growing movement within the District to combat wasteful spending, per Jan Sulcove, there was similar mounting dissatisfaction with Plaintiffs' performance of their solicitor duties. See Exhibit A, pg. 69.

18. For at least two years prior to 2015, the minority board members did not have confidence in Plaintiffs as District Solicitor due to these members feeling that Plaintiffs gave poor legal advice. See Exhibit F, pg. 57.

19. Well before any political activity by Plaintiffs, the four minority board members elected to pursue a Board vote on whether or not to pursue a solicitor RFP in 2014. See Exhibit B at #6.05; Exhibit G, pg. 166.

20. Contemporaneous email communications from the years leading up to the election solidify the existence and legitimacy of these concerns from Common $ense members, community members, opposing counsel, and even CVEE supporters (Sylvia Rockwood and Billy Hodge). See Exhibit R; See also Exhibit G, pg. 163; Exhibit F, pg. 32 (there was "overwhelming" community support for this change).

21. The testimony and paper record is replete with references as to why Plaintiffs were released, none of which support Plaintiffs' constitutional claims.

22. Superintendent, Dr. Joseph Padasak, was clear that Plaintiffs were not terminated for political reasons. See Exhibit I, pgs. 136, 189, 254.

23. Defendants Mark Schur and Defendant Alex Sharpe also testified to a litany of reasons for wanting to release Plaintiffs, none of which support any inference that political patronage influenced that reason. See Exhibit H, pg. 37; See Exhibit G, pg. 143, 163.

24. Defendants Dana Baker and Carl Barton echoed similar sentiments for releasing Plaintiffs, none of which had anything to do with Plaintiffs' political behavior. See Exhibit F, pg. 57, 79; Exhibit Z, pgs. 16-25, 89.

25. Defendants Bill Lennartz and Joan Smith were also unequivocal in their rationale for releasing Plaintiffs which, once again, had nothing to do with their political behavior. See Exhibit AA, pgs. 18-21, 38; Exhibit V, pgs. 77, 100, 109, 119, 134, 136, 137, 141.

26. Defendant Ed Norcross' reasons for wanting to release Plaintiffs were well documented, began well before any political behavior by Plaintiffs, and accordingly, had nothing to do with Plaintiffs' political leanings. See Exhibit W, pgs. 42-43.

27. Defendant Robert Floyd actually voted to renew Black & Davison in 2015, but decided to release Plaintiffs from their role as District Solicitor in 2016 for reasons completely unrelated to political affiliation. See Exhibit X, pgs. 11-12, 14.

28. Defendant Kevin Mintz, an independent, also had reasons for releasing Plaintiffs which, had nothing to do with their political leanings. See Exhibit O, pgs. 27, 31, 47-48, 51.

29. These bona fide concerns about Black & Davison's performance and billing practices gave Defendants the right to replace Black & Davison as School District Solicitor, according to John Freund, an undisputed expert in this area of the law. See Exhibit Y.

30. Even Plaintiff Jan Sulcove himself, during his deposition, was unable to cite any specific and genuine facts which support his claims of termination for political purposes. See Exhibit A, pgs. 433-438.

31. Plaintiffs' assertions that their claims are supported by certain CVEE-associated employees being "purged" by Defendants (see ECF 24, ¶¶ 47-49) are also completely devoid of factual support on the record.

32. Plaintiff Jan Sulcove could cite no evidence during his deposition which supported that Rockwood, Chapel, or Weller were released due to their support of CVEE. <u>See</u> Exhibit A, pgs. 121-124; <u>See also</u> Exhibit I, pgs. 181, 248 (Rockwood left due to receiving an offer from the Carlisle Hospital and Chapel was considered a "lightning rod" who refused to abide by his supervisor); Exhibit S.

33. The only alleged "facts" which exist on the record to support Plaintiffs being released from their role as District Solicitor are contained within the two sham affidavits from CVEE supporters Stanley Helman and Phillip Miracle which were authored solely to defeat summary judgment arguments. <u>See</u> Exhibit Q.

34. These affidavits were provided on the very last day of fact discovery despite much earlier requests from Defense Counsel, to which Plaintiffs' Counsel never responded, that Plaintiffs identify the fact witnesses they intended to call at trial so that their deposition could be taken. <u>See</u> Exhibit Q.

35. The safeguards against such sham affidavit concerns, which would have been the opportunity to cross-examine the affiants during a deposition could not occur because Plaintiffs' Counsel previously ignored all such requests.[2] <u>See</u> Exhibit Q.

36. These affidavits are the very definition of "sham affidavits" under the analysis set forth by the Third Circuit in <u>Jiminez</u>, 503 F.3d, and the Court should rightfully disregard these affidavits as the "sham" that they are because they create no *genuine* issues of fact. <u>See</u> <u>id.</u>

37. What fact discovery did actually establish, however, is overwhelming factual support that Plaintiffs' release from their role of District Solicitor was the result of a longstanding

---

[2] Even though Plaintiffs' Counsel will claim that they offered to have Helman and Miracle be deposed after the factual discovery deadline, such would have proven highly problematic given the summary judgment deadline. As it were, the transcripts from the depositions of several defendants were received only two days before the Summary Judgment deadline.

{W0930416.1}                                7

desire for change regarding the District's wasteful financial practices along with a dissatisfaction with Plaintiffs' legal services.

38. This factual support is abundant, contemporaneously documented, and further solidified through the deposition testimony.

39. Part of that change was necessarily parting ways with Black & Davison who themselves embodied wasteful practices and unsatisfactory legal performance, were "enmeshed" with business as usual, and aimed to marginalize Common $ense supporters in any way their duties allowed them to.

40. There are no genuine issues of material fact regarding the reasons why Black & Davison were released from their role because, as has been demonstrated, Common $ense members, the District Superintendent, CVEE members, and even Plaintiffs' themselves all acknowledged the public's desire for change within the District which culminated in a landslide victory for the Common $ense agenda in 2015.

41. There are no facts of record that have been established during fact discovery which supports the contention that Plaintiffs were terminated, at all, let alone solely for their support of the CVEE ticket. See Ness v. Marshall, 660 F.2d 517, 520 (3d. Cir. 1981); See also Branti v. Finkel, 445 U.S. 507, 516 (1980) (First Amendment protections apply when an individual's political beliefs are "*the sole basis for depriving him of continued employment*") (emphasis added); Elrod v.Burns, 427 U.S. 347 (1976).

42. Any finding, based upon the facts of record, that Plaintiffs were released for political reasons would be the result of pure speculation and conjecture.

43. Accordingly, Defendants respectfully request that this Honorable court grant Summary Judgment in favor of all Defendants and dismiss all of Plaintiffs' claims with prejudice.

**b. Defendants are entitled to Summary Judgment because there are no genuine issues of material fact suggesting defendants are not entitled to qualified immunity**

44. The doctrine of qualified immunity provides that government officials "performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982).

45. Qualified immunity is an "entitlement" that represents "an immunity from suit rather than a mere defense to liability" and is "effectively lost" if a case is erroneously permitted to go to trial. Mitchell v. Forsyth, 472 U.S. 511, 526 (Pa. 1985).

46. The issue of qualified immunity should not be routinely submitted to the jury, but rather, "should be decided by the court long before trial." Hunter v. Bryant, 502 U.S. 224, 228 (1991).

47. The doctrine of qualified immunity is an "accommodation of competing values," that allows a plaintiff to recover when the government actor's actions are "plainly incompetent or knowingly violated the law," but a state officer who makes a reasonable mistake about the legal constraints of his actions is immunized from suit." Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted).

48. To avoid qualified immunity, an individual must take actions under the color of state law, and the individual must violate a right that is "so clearly established that any reasonable officer would have known of it... [The analysis of whether the right was so clearly established] 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" George v. Rehiel, 738 F.3d 562, 572 (3d Cir. 2013) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)).

49. For a right to be considered clearly established, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" and the unlawfulness of that behavior "must be apparent." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal citations omitted).

50. In the instant matter, in order for Defendants not to be afforded qualified immunity, fact discovery would have had to produce facts which established that it was "clearly established" in the specific context of this case that the Solicitor for the Chambersburg Area School District could engage in unfettered political patronage and, as such, it was clearly established to a reasonable board member that political affiliation was not a requirement for this particular solicitor position.

51. There are no facts of record which suggest Defendant Board members appreciated and/or distinguished Mr. Sulcove's political activities were being undertaken by Mr. Sulcove in his personal capacity as opposed to as Solicitor for the School District, especially considering that Jan Sulcove was campaigning for the School Board election and using his law firm to do so.

52. Further, fact discovery revealed that Mr. Sulcove "politicized" the position of solicitor by virtue of his very close "affiliation" with certain individuals (the 2013-14 majority board members) such that no reasonable Board member could think it was "clearly established" that such an affiliation was not a requirement of this particular solicitorship – at least if the Board member wanted the Solicitor to faithfully implement their agenda.

53. In addition to the political activities which Plaintiffs readily admit within their complaint (see ECF No. 24, ¶¶ 38-43), fact discovery has revealed that, leading up to the 2015 election, the solicitorship and political activity were intertwined as one, all due to Plaintiffs' behavior.

54. Plaintiffs unabashedly used their position and powers as solicitor for the School District to the detriment of Common $ense members, as evidenced by Jan Sulcove using his power as District Solicitor to prepare censures for Common $ense supporters Ed Norcross, Dana Baker, and Joan Smith, in the months/years leading up to the primary election, despite never previously using his power of censure during his forty-plus year tenure. See Exhibit A, pgs. 63-67.

55. Further politicizing his position, Jan Sulcove's disdain for the Sharpe family (Common $ense supporters) permeated the execution of his solicitor duties. See Exhibit K.

56. Jan Sulcove also politicized his Solicitor role by frequently limiting meetings and/or email recipients solely to CVEE Supporters and demeaning Common $ense members within his legal advice, notably referring to Ed Norcross as a "dipshit." See Exhibit K.

57. In Jan Sulcove's own political words, he advised that "extreme caution is the watchword of the day in every decision involving potential new board members." See Exhibit K.

58. In addition to his disdain for Common $ense members, Jan Sulcove frequently and often intertwined his support for CVEE with his official Black & Davison capacity. See Exhibit J.

59. Jan Sulcove put his loyalties to CVEE ahead of his duties to his school board clients, as evidenced by him preparing an "Anti-Joan Smith" letter, while Joan Smith was a member of the School Board which he represented, to be published to the community within the local media. See Exhibit J.

60. Not only did he politicize the execution of his Solicitor duties, but Jan Sulcove also politicized the very process by which the Solicitor is chosen during the 2015 Solicitor RFP. See Exhibit M.

61. The role of CASD Solicitor was politicized from selection through execution.

62. There are no genuine issues of material fact regarding Defendants being entitled to qualified immunity because no reasonable board member would look at the Mr. Sulcove's foregoing conduct and believe it "clearly established" that political affiliation was not a necessary component to the position of District Solicitor.

63. Surely, a reasonable board member who considered the extent of Plaintiff's politicization and thought that political affiliation was a pertinent consideration for this particular solicitorship would not be thought to be "plainly incompetent" or "knowingly violating" the law, as required by Curley, 499 F.3d at 206-07; See also Hope, 536 U.S. at 739 (the unlawfulness "must be apparent" to a reasonable official).

64. Plaintiffs obvious and arrogant intermingling of their political leanings into their solicitor performance and the "independent" Solicitor RFP process make the determination of qualified immunity entirely inappropriate to submit for jury considering given the established facts of this particular solicitorship. See Curley v. Klem, 298 F.3d 271, 277 (3d. Cir. 2002); Hunter v. Bryant, 502 U.S. 224, 228 (1991).

65. Accordingly, Summary Judgment should be awarded to the Defendant Board members because there is no question that they are entitled to qualified immunity under the facts and circumstances of this case.

**c. Defendants are entitled to Summary Judgment because First Amendment considerations do not apply to Plaintiffs role as District Solicitor due to the inherent policymaking nature of the position.**

66. The dismissal of public employees solely based on their partisan political affiliation has been held to infringe upon first amendment rights of belief and association. See Ness v. Marshall, 660 F.2d 517, 520 (3d. Cir. 1981); See also Branti v. Finkel, 445 U.S. 507, 516 (1980)

(First Amendment protections apply when an individual's political beliefs are "the sole basis for depriving him of continued employment"); Elrod v.Burns, 427 U.S. 347 (1976).

67.     However, patronage dismissals of employees in policymaking positions has been deemed by the Courts to be not actionable. See Elrod v.Burns, 427 U.S. 347, 367 (1976).

68.     When determining whether a position is considered to be policymaking in nature, thus making a patronage dismissal appropriate, the courts will generally consider whether such employees: 1) Act as advisers, 2) Formulate plans for implementing broad goals, and/or 3) Have a broad scope of responsibilities. See Ness, 660 F.2d at 520 (citing Elrod, 427 U.S. at 368).

69.     In refining the Elrod factors, the Court observed that ""the ultimate inquiry is not whether the label of 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti v. Finkel, 445 U.S. 507, 518 (1980).

70.     This inquiry is "inherently fact specific" and requires the court to examine the nature/responsibilities of the job at issue, along with the functions of the public office in question and not the actual past duties of the employee(s) involved. See Wetzel v. Tucker, 139 F.3d 380, 383-384 (3d. Cir. 1998).

71.     Patronage dismissals have been held to not offend the First Amendment where a difference in party affiliation will "be highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office." Ness, 660 F.2d at 521.

72.     In these situations, clients have a right to have the assurance that the Solicitor share the same political ideology as the board and "[t]hese situations are exactly the types for which the

Supreme Court created the Elrod/Branti exception." See Wetzel, 139 F.3d at 386; See also Ness, 660 F.2d at 522.

73. Here, fact discovery has established Plaintiffs' role as District Solicitor was comprised of advising and policymaking across a broad range of topics and the implementation of the Board's agenda and vision.

74. Plaintiff Jan Sulcove admits that, with regard to the advice provided by Plaintiffs, one such use for that advice was to develop policy based upon the advice provided. See Exhibit A, pg. 235.

75. Mr. Sulcove's position as solicitor required Plaintiffs to advise and prepare policy focusing on a broad range of issues. See Exhibit T; Exhibit A, pg. 234.

76. Due to the breadth of topics covered by Plaintiffs' advice, as well as, their involvement in every stage of policymaking, Plaintiffs role as Solicitor established Plaintiffs as an essential figure in formulating plans for implementing broad goals for the District.

77. Plaintiffs were not just an integral part of policymaking, but they further politicized their policymaking, often preparing advice and policies aimed to silence/curtail the Common $ense members and agenda. See Exhibit T.

78. Despite Plaintiff's documented involvement in policymaking, the very policymaking nature of this position is further evidenced by being a requirement within the solicitor RFP that served as the basis for Plaintiffs' three year contract and their responsibilities as Solicitor as a whole. A true and correct copy of the Solicitor RFP from 2015 is attached hereto as **Exhibit BB.** See Exhibit BB, at 3.2.10-3.2.11.

79. Under Elrod, the foregoing shows that this particular solicitorship would be considered a "policymaking" position.

80. The Common $ense board members did not have faith that Plaintiffs would be able to implement the change that Common $ense sought because Jan Sulcove frequently politicized his policy preparation with the ultimate goal of curtailing Common $ense members in some way, shape, or form. <u>See</u>, e.g. Exhibit G, pgs. 143, 163; Exhibit F, pgs. 87-88; Exhibit V, pgs. 134, 136, 137, 141; Exhibit T.

81. Party affiliation was an appropriate requirement for the effective performance of Plaintiffs role as solicitor, as required by <u>Branti</u>, 445 U.S. at 518, because Plaintiffs actively used their role and powers as Solicitors to undermine the Common $ense agenda.

82. Plaintiffs' behavior demonstrates the paradigmatic example of why the <u>Elrod</u> and <u>Branti</u> exception exists: How can it be said that Plaintiffs could effectively carryout the agenda of the Common $ense board when they actively worked to subvert it?

83. The new Board had the right to have as its solicitor a firm which shared its vision, objectives and affiliation so as to effectuate their desired change mandated by popular vote. <u>See</u> <u>Wetzel</u>, 139 F.3d at 386; <u>See also</u> <u>Ness</u>, 660 F.2d at 522.

84. Likewise, the Board has the right to be assured that the solicitor working for it will not act to subvert its goals and intended direction. <u>See</u> Exhibit Y, ¶ 31 (the board having confidence in their solicitor is an "absolutely necessary qualification for the effective performance of the Solicitor's duties.").

85. Like in <u>Wetzel</u> and <u>Ness</u>, where summary judgment was granted because first amendment protections were deemed to not apply to particular solicitor positions for similar reasons, Defendants in the instant matter had the right to have a Solicitor whom they could trust to effectuate their change, rather than one who actively worked to oppose and undermine their agenda through their policymaking and advising powers.

86.     As such, first amendment protections do not apply to Plaintiffs and summary judgment is proper due to the advisory and policymaking nature of this position, as well as, Plaintiffs' behavior which establishes that they would not be able to effectively perform their role, and carryout Defendants' agenda, as Solicitor under the particular circumstances of this case.

   **d. Defendant Ed Norcross is entitled to summary judgment because he was not present for, and did not participate in the vote to release Plaintiffs from their role as District Solicitor.**

87.     Within Plaintiffs' Amended Complaint, it is alleged that "[a]ll of the individual defendants on the board voted for termination." See ECF No. 24 ⁋ 51.

88.     However, Defendant Ed Norcross was not present for and did not participate in this vote. See at Roll Call & #10.01; Exhibit W, infra, pgs. 39, 44.

89.     Accordingly, Defendant Ed Norcross is also entitled to summary judgment because he did not participate in the vote which serves as the basis for Plaintiffs' First Amendment claims.

   **e. Defendant Chambersburg Area School District is entitled to summary judgment because there are no facts of record which support CASD developing and/or maintaining deficient policies and/or customs which caused the deprivation of Plaintiffs' constitutional rights.**

90.     Within Plaintiffs' amended complaint, it is alleged that "Defendant CASD developed and maintained a number of deficient policies and/or customs which caused the deprivation of Plaintiffs' constitutional rights." See ECF No. 24 ⁋ 75.

91.     However, fact discovery has established that no such policies and/or customs ever existed.

92.     Plaintiffs served as District Solicitor for forty-plus years and would have been the party responsibility for preparing any such policies and/or customs, yet to Defendants' knowledge, no such claims have ever been made prior to the instant matter.

93. Plaintiffs allege that their release from their position as solicitor was further evidenced by Defendants "purging" the School District of CVEE supporters by targeting District employees Sylvia Rockwood, Burdette Chapel, and Kevin Weller. See ECF 24, ¶¶ 47-49.

94. Such allegations would be the germane allegations to establishing the policies or customs alleged against the District in Plaintiffs' Amended Complaint.

95. However, Plaintiff Jan Sulcove could cite no evidence during his deposition which supported that Rockwood, Chapel, or Weller were released due to their support of CVEE. See Exhibit A, pgs. 121-124; See also Exhibit I, pgs. 181, 248 (Rockwood left due to receiving an offer from the Carlisle Hospital and Chapel was considered a "lightning rod" who refused to abide by his supervisor); Exhibit S.

96. Accordingly, Defendant Chambersburg Area School District is entitled to summary judgment because no facts of record exist which support any such deficient policies and/or customs existing at the School District.

**WHEREFORE**, Defendants respectfully request that this Honorable Court grant summary judgment in favor of all Defendants and dismiss all claims against all Defendants with prejudice.

        Respectfully submitted,

        **FOWLER HIRTZEL MCNULTY & SPAULDING, LLP**

        **BY**: _____

Dated: June 10, 2019        Gregory S. Hirtzel, Esquire
        I.D. # 56027
        1860 Charter Lane, Suite 201
        Lancaster, PA 17601
        Phone: (717) 553-2604
        Fax: (717) 344-5560
        Email: ghirtzel@fhmslaw.com

## CERTIFICATE OF SERVICE

I, Patricia L. Glasz, an employee of the law firm of Fowler, Hirtzel, McNulty & Spaulding, LLP certify that a true and correct copy of the foregoing document has been served upon the below individuals via e-filing as indicated on the date set forth below:

Mark B. Frost, Esquire
Mark B. Frost & Associates
1515 Market Street, Suite 1300
Philadelphia, PA 19102
*Attorneys for Plaintiffs*

**FOWLER HIRTZEL MCNULTY & SPAULDING, LLP**

BY: */s/ Patricia L. Glasz*

Dated: June 10, 2019

Patricia L. Glasz, Pa.C.P.
Paralegal