**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

BLACK & DAVISON, JAN G. SULCOVE, ESQUIRE, ROBERT C. SCHOLLAERT, ESQUIRE, ELLIOTT B. SULCOVE, ESQUIRE, JERROLD A. SULCOVE, ESQUIRE, MARK T. ORNDORF, ESQUIRE,

               Plaintiffs,

     v.

CHAMBERSBURG AREA SCHOOL DISTRICT, DANA BAKER, WILLIAM LENNARTZ, CARL BARTON, EDWARD NORCROSS, JOAN SMITH, ROBERT FLOYD, MARK SCHUR, KEVIN MINTZ, ALEXANDER SHARPE,

               Defendants.

**CIVIL ACTION**

**NO. 1:17-CV-00688-CCC**

**(BEFORE THE HONORABLE CHIEF JUDGE CHRISTOPHER C. CONNER)**

**Defendants' Brief in Support of their Motion for Summary Judgment**

**Table of Contents Pursuant to Local Rule 7.8**

I.   Procedural History …………………………………………………………….. 4

II.  Statement of Facts  ……………………………………………………………  4
    Historical Background – Black & Davison ……………………………………. 4
    Chambersburg Area School District Solicitor …………………………………..6
    Historical Background – Chambersburg Area School District ………………………… 8
    The 2015 School Board Primary Election …………………………………….. 11
    Black & Davison's Release from Solicitor Duties ……………………………….. 17

III  Statements of Questions Involved ……………………………………………… 24

IV. Legal Arguments ………………………………………………………….... 25
    a.   There are no genuine issues of fact regarding whether Plaintiffs were
       released from their role as District Solicitor for improper reasons ……………....... 26
    b.   There are no genuine issues of fact suggesting Defendants are not
       entitled to qualified immunity …………………………………………… 33
    c.   First Amendment consideration to not apply to Plaintiff's role as District
       Solicitor ………………………………………………… 38
    d.   Defendant Ed Norcross is entitled to summary judgment ………………………… 42
    e.   There are no facts of record which support CASD developing and/or
       maintaining constitutionally-deficient policies and/or customs …………………… 42

V. Conclusion ………………………………………………………………… 43

## Table of Authorities Pursuant to Local Rule 7.8

**Rules**
Fed. R. Civ. P. 56 …………………………………………………………………….. 25

**United States' Supreme Court Cases**
Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) ………………………………...………….. 34
Ashcroft v. Al-Kidd, 563 U.S. 731 (2011) …………………………………..………… 34
Branti v. Finkel, 445 U.S. 507 (1980) ……………………………………..  32, 38, 39, 41, 42
Brosseau v. Haugen, 543 U.S. 194 (2004) ………………………………………………. 34
Elrod v.Burns, 427 U.S. 347 (1976) ……………………………….………. 32, 38, 39, 41, 42
Harlow v. Fitzgerald, 457 U.S. 800 (1982) ……………………………………………… 33
Hope v. Pelzer, 536 U.S. 730 (2002) ……………………………………...……….. 34, 37
Hunter v. Bryant, 502 U.S. 224 (1991) ……………………………………………. 33, 38
Mitchell v. Forsyth, 472 U.S. 511 (Pa. 1985) ……………………………………………. 33
Pearson v. Callahan, 129 S. Ct. 808 (2009) ………………………………………..... 34
United States v. Lanier, 520 U.S. 259 (1997) …………………………………….. 34, 37

**Third Circuit Court of Appeals Cases**
Baer v. Chase, 392 F.3d 609 (3d. Cir. 2004) ……………………………………………. 26
Curley v. Klem, 298 F.3d 271 (3d. Cir. 2002) …………………………………....... 33, 37, 38
Doherty v. Allstate Indem. Co., 734 Fed. Appx. 817 (3d. Cir. 2018) ………………….... 26
EBC, Inc. v. Clark Bldg. Sys., 618 F.3d 253 (3d. Cir. 2010) ………………………………  26
George v. Rehiel, 738 F.3d 562 (3d. Cir. 2013) ……………………………………………. 34
Halsey v. Pfeiffer, 750 F.3d 273 (3d. Cir. 2014) ………………………………….. 25, 34
Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247 (3d. Cir. 2007) ……………….....… 26, 31
Ness v. Marshall, 660 F.2d 517 (3d. Cir. 1981) …………………………....... 32, 38, 39, 41, 42
Wetzel v. Tucker, 139 F.3d 380 (3d. Cir. 1998) …………………………...……….. 39, 41, 42
Zold v. Mantua, 935 F.3d 633 (3d. Cir. 1991) …………………………………………… 32

**Middle District Cases**
DeWees v. Haste, 620 F. Supp 2d 625 (M.D. Pa. 2009) ……………….............................. 25

**Defendants' Brief in Support of their Motion for Summary Judgment Pursuant to Federal
Rule of Civil Procedure 56**

Defendants, by and through their counsel, Fowler Hirtzel McNulty & Spaulding, LLP,

respectfully file this Brief in Support of their Motion for Summary Judgment pursuant to Fed. R.

Civ. P. 56 and state as follows:

## I.   PROCEDURAL HISTORY

On April 18, 2018, Plaintiffs filed an Amended Complaint in the instant matter. See ECF

No. 24.  After granting in part and denying in part Defendants Motion to Dismiss Plaintiffs'

Amended Complaint, this Honorable Court then extended the fact discovery deadline to April

30, 2019. See ECF Nos. 46, 47, 50, and 52.  The dispositive motion deadline was set by the

Court at May 31, 2019. See ECF 52.  On May 31, 2019, Defendants filed their Motion for

Summary Judgment (ECF 54) and respectfully offer this Brief in support thereof.[1]

## II.   STATEMENT OF FACTS

### Historical Background – Black & Davison

Plaintiffs allege that they were the District Solicitor for the Chambersburg Area School

District between 1971 and 2015. See ECF. No. 24 at ¶ 19.  For the majority of that forty-plus

year tenure, Plaintiffs did not have a contract with the School District. True and correct copies of

Plaintiff Jan Sulcove's deposition transcripts have been attached to the corresponding motion as

**Exhibit A**. See Exhibit A, pgs. 71-72.  Prior to the 2014-2015 school year, Plaintiffs would

receive a letter from the business officer requesting Plaintiffs to express their interest in serving

as solicitor for a particular school year. See id., pg. 72.  Plaintiffs would then respond to the

business office indicating their interest in serving as solicitor for that respective year, as well as,

---

[1] Defendants then re-filed their Motion for Summary Judgment, on June 10, 2019, to ensure compliance with Local
Rule 56.1, as well as, the Court's June 5th, 2019, Order.

a proposed hourly rate. See id.  An item would then be added to the school board agenda and, at the next board meeting, the item would then be voted on by the School Board. See id.

Despite this forty-year procedure, in 2014, a written contract for the Solicitorship was suddenly entered into between the School District and Plaintiffs' law firm. See id., pg. 275.  Not coincidentally, around this same time in 2014, when Plaintiffs first-ever contract was executed, there was also a movement within the School Board to pursue a Request for Solicitor Proposals ("RFP").  True and correct copies of the March 26, 2014, School Board Meeting Minutes evidencing the motion to pursue a 2014 Solicitor RFP have been attached to the corresponding motion as **Exhibit B**. See Exhibit B, at #6.05.

The movement in 2014, supported by four of the nine voting board members (all Defendants in the instant action), to seek proposals to replace Black & Davison as solicitor occurred before there were any "political factions" and any 2015 election campaigning by any of the Plaintiffs.  See Exhibit A, pg 272.  In May, 2015, new school board candidates ("Common $ense") who, like the four board members referenced above, were dissatisfied for a litany of reasons with the direction and decisions of the District under the Solicitor's counsel, swept the May 2015 primary School Board election on May 19, 2015. See ECF No. 24, ⁋ 24.

Immediately thereafter, on May 27, 2015, in an effort to preserve their perceived birthright as Solicitor, and while the supporters who were affiliated with Plaintiffs were still in control of the board, Plaintiffs entered into a never before seen three year contract with the School District, placing for cause termination provisions within the contract that contravened Pennsylvania Law. A true copy of this 2015 three year contract is been attached to the corresponding as **Exhibit C**. See Exhibit C; See also ECF No. 22, pg. 11 ("although the Agreement, on its face, states that it could only be terminated for cause . . . this provision contravenes Pennsylvania law.").

Plaintiff's claim that this three year contract was entered into as an inducement for Plaintiffs to accept a lower hourly rate (see ECF No. 24, ⁋ 24), however, there are no facts of record to support this assertion. Rather, true and correct copies of communications evidencing Plaintiffs' seeking the lower contractual rates, and a three year term, throughout the process which led to this 2015 contract have been attached to the corresponding motion as **Exhibit U**. See Exhibit U.

This three year contract, which was prepared by Plaintiffs and contravened Pennsylvania law, was to be in effect from July 1, 2015 through June 30, 2018 and provided that notice of non-reappointment was required to be given to Plaintiffs not less than ninety (90) days prior to June 30 of each year covered under the contract. See Exhibit C at "VI. Separation." At the March 23, 2016 School Board meeting, the new Board members who were present, as well as, the incumbent members, voted unanimously to release Plaintiffs from their duties as Solicitor, complying with the 90 day Notice requirements. A true copy of the March 23, 2016 board minutes have been attached to the corresponding motion as **Exhibit D**. See Exhibit D at #10.01. Board member and Defendant Ed Norcross was not present at this meeting and did not participate in the vote to approve that solicitor services with Plaintiffs be discontinued. See Exhibit D, at Roll Call & #10.01; Exhibit W, infra, pgs. 39, 44.

### Chambersburg Area School District Solicitor

The position of Solicitor for the Chambersburg Area School District encompassed a litany of duties. Chiefly among the responsibilities of the District's Solicitor would be the responsibility to advise the District and make policy for the District when necessary. True copies of email correspondence illustrating Plaintiffs' involvement in advising and policymaking for a broad range of issues have been attached to the corresponding motion as **Exhibit T**. See Exhibit A, pg. 235, lines 14-23.

Beyond recommending and drafting censures of certain board members (e.g., those board members who wanted Plaintiffs removed as solicitor well before any "political affiliation" occurred (see Exhibit A, pgs. 63-67), the position of Solicitor in this District under Plaintiffs' counsel evolved to the point that the District looked to the Solicitor to advise and prepare policy focusing on matters from: First amendment issues regarding the Confederate Flag, School Board code of conduct, confidentiality, communication policies, separation of church and state issues regarding secular holiday concerts, school logo trademark issues, athletic booster club issues, and policies regarding opioid reversal (Naloxone). See Exhibit T.

As can be seen within Exhibit T, Plaintiffs' duties as Solicitor directly affected the School District's overall operation and function.   The breadth of involvement of the Solicitor in formulating this advice and associated policies show that the District Solicitor was an essential figure in formulating plans for implementing broad goals for the District.   Per John Freund, III, Esquire, a school law expert and attorney with expertise in School District and School Board matters with over 40 years of experience spanning 22 District Solicitorships, due to the close relationship between Solicitors and policy agendas, School Boards are entitled to legal counsel who have compatible policy agenda views and will be loyal and provide zealous and competent representation. A true and correct copy of Mr. Freund's affidavit has been attached to the corresponding motion as **Exhibit Y**. See Exhibit Y, ⁋ 22-24.

As alluded to above, in addition to advising and policymaking, in the few years before the election that voted out the 5 board members which constituted the board "majority" which had supported Plaintiffs, Jan Sulcove recommended to the majority and prepared for it censures and policies which rebuked the minority board members who opposed his/the majority of the school board's policies and status quo. See Exhibit T; See also Exhibit A, pgs. 63-67.

**Historical Background – Chambersburg Area School District**

As early as 2003, community members were lobbying to try to change the direction of the Chambersburg Area School District. A true copy of the deposition transcript of community member Jack Sharpe, local attorney and father of current board member Alex Sharpe, is attached to the corresponding motion as **Exhibit E**. See Exhibit E, pg. 7. Generally speaking, the discussion to change the direction of the District and oppose the District's status quo centered on wasteful spending. See Exhibit A, pg. 41.  This status quo, a "good ol' boys club" of sorts, was personified by individuals who were long time district representatives, like Board Member Stanley Helman who was in his position of power at the District for 20+ years. See Exhibit V, infra, pgs. 21-22.

Black & Davison, by virtue of their 40+ year tenure was "enmeshed" with this status quo and frequently pursued District action regardless of what the community may have wanted. See Exhibit V, infra, pgs. 21-22, 108.  The first School Board member who took up this cause to change the status quo was Defendant Carl Barton, who was on the board for many years, beginning in 2008, prior to the 2015 election. See Exhibit A, pg. 43.  True and correct copies of Carl Barton's transcripts have been attached to the corresponding motion as **Exhibit Z**. See Exhibit Z, pg. 7.

Defendant Joan Smith, elected to the Board in 2011, was the second board member who, with Barton, was "going to take whatever actions they thought appropriate to cut wasteful spending." See Exhibit A, pgs. 42-43. A true copy of Defendant Joan Smith's deposition transcript has been attached to the corresponding motion as **Exhibit V**.  Prior to gaining additional board support, Carl Barton had difficulty being taken seriously by previous board regimes because he "did not fall in line" with the long standing district status quo. See Exhibit V, pg. 19.  Joan Smith experienced similar hardship during her early time on the board, often being belittled by Plaintiff

Jan Sulcove and "going through hell" because of him and the "good ol' boys club." See Exhibit V, pg. 77.

Ideas from board members who were "not in favor" were often silenced and ruled out of order by Plaintiff Jan Sulcove. See Exhibit V, pg. 90. Through the 2015 elections, the board majority, led by Stanley Helman, Phillip Miracle and Kim Amsley-Camp, were advised by Plaintiff/Solicitor Jan Sulcove, who then implemented their policy strategies and created a "mess" in the District. See Exhibit V, pg. 85. Due to this, there were various other groups throughout the years who appeared before the Board, requesting the same change in policy dealing with wasteful spending. See Exhibit A, pg. 44.

Following Smith and Barton, Defendant Ed Norcross and Defendant Dr. Dana Baker came onto the School Board in 2013. See Exhibit A, pg. 47; See Exhibit V, pg. 16. A true copy of Defendant Dr. Dana Baker and Defendant Edward Norcross' transcripts have been attached to the corresponding motion as **Exhibit F** and **Exhibit W**, respectively. See Exhibit W, pg. 6. When Dr. Baker was elected to the Board in 2013, there was a "tremendous amount of turmoil" from the electorate regarding the then-existing board. See Exhibit F, pg. 16.

When (or perhaps because) Norcross, Smith, and Baker became part of the School Board, there was increased friction between certain board members and district administration. See Exhibit A., pg. 48. Reflecting their desire to curb what they believed was wasteful spending, these new board members began to submit Right-To-Know requests regarding School District financials. See Exhibit A, pg. 53. During the 2013-2015 time period, there were many discussions between community members and School District personnel regarding what could be done to bring the School District back to focusing on education and financial accountability. See Exhibit E, pgs. 12-13.

Before the 2015 primary election run up and while Barton, Smith, Dr. Baker, and Norcross were in the "minority," these minority board members expressed dissatisfaction with the legal representation that the District was receiving from Plaintiffs. See Exhibit A, pg. 69. Prior to 2015, due to perceived issues with Black & Davison's performance, their role as District Solicitor had been discussed between then minority board members Smith, Norcross, Baker, & Barton for two years before the 2015 election. See Exhibit F, pg. 57.

In the years leading up to 2015, the minority board members did not have confidence in Plaintiffs as District Solicitor, due to these members feeling that Plaintiffs gave poor legal advice. See Exhibit F, pg. 79. These concerns lead, on March 26, 2014, prior to any political activity occurring, to Defendant Ed Norcross making a motion to add an item to the Board agenda which would approve advertising a Solicitor Request for Proposals ("RFP") for the 2014-2015 School Year. See Exhibit B at #6.05; Exhibit W, pg. 25.

The motion ultimately failed by a narrow 5-4 vote, but was influenced by Plaintiff Jan Sulcove's manipulation of the rules of parliamentary procedure so that a super majority, rather than a simple majority, would be needed to amend the agenda, thereby prohibiting the board from further pursuing a Solicitor RFP in 2014. A true copy of the transcript from Defendant Alex Sharpe's deposition is attached hereto as **Exhibit G**. See Exhibit G, pgs. 166-168; Exhibit W, pg. 36. Prior to 2015 there were rival factions on the School Board rooted in different philosophies and the solicitor, Jan Sulcove, in the course and scope of his duties as solicitor, clearly sided with the faction that was the "majority" before the 2015 election. See, e.g., Exhibits J &K, infra.

**The 2015 School Board Primary Election**

After the March 2014 attempt, prior to any political behavior, to add a motion to the board meeting agenda to pursue a Solicitor RFP failed, the issues of desired change, wasteful spending, and dissatisfaction with Plaintiffs' Solicitor services continued to serve as point of contention within the District.  During this time, the School Board remained divided, with Dana Baker, Ed Norcross, Carl Barton, and Joan Smith (the "minority" at the time) largely supporting and agenda which later came to be known as the Common $ense agenda and Robert Floyd, Stanley Helman, Kim Amsley-Camp, and Phillip Miracle supporting what would later become known as the Candidates for Value and Excellence in Education ("CVEE") agenda. See ECF 24, ¶¶ 35-36. Board member Ann Boryan was not, per se, associated with either side.

The only "minority" Board member whose seat was up for re-election in 2015 was Defendant Joan Smith. See ECF 24, ¶ 36.  The "Candidates for Common $ense" Political Action Committee ("PAC") was formed in 2015, prior to the May 2015 Primary School Board election. See Exhibit E, pg. 13, Exhibit F, pgs. 17, 100.  Even though formally founded in 2015, the platform that was formally embodied by the "Common $ense" candidates began in 2013 with the goal of effecting desired change within the School District. See Exhibit E, pg. 9-10.  The Candidates for Common $ense were a group of individuals who shared common opinions and were trying to bring a different perspective to the School District by being a catalyst for change. A true copy of the transcript from Defendant Mark Schur's deposition is attached to the corresponding motion as **Exhibit H**. See Exhibit H, pgs. 8-9.

Defendant William Lennartz decided to run for School Board in 2015, after speaking with Joan Smith, because he felt the District was headed in the wrong direction and he wanted to make a difference.  True and Correct copies of Mr. Lennartz's deposition transcripts have been attached

to the corresponding motion as **Exhibit AA**. <u>See</u> Exhibit AA, pg. 6.   The candidates who identified with the Common $ense agenda during the 2015 School Board election were Defendants Mark Schur, Alexander Sharpe (son of Jack Sharpe), Joan Smith, and William Lennartz. <u>See</u> ECF 24, ⁋ 36.

Defendant Kevin Mintz was not a Candidate for Common $ense, but rather, ran as an independent candidate.  A true copy of the transcript from Kevin Mintz's deposition has been attached to the corresponding motion as **Exhibit O**. <u>See</u> Exhibit O, pg. 7.  Mintz, however, shared concerns about wasteful spending within the District. <u>See</u> Exhibit O, pg. 31, 33.  Because one of the main concerns of the Common $ense group was wasteful spending within the School District, the group chose to memorialize that concern by using the "$" within their name. <u>See</u> Exhibit H, pg. 9.  Other objectives of the Common $ense members' were to change "business as usual" within the School District and to redirect where the District was going from an educational perspective. <u>See</u> Exhibit H, pg. 10.

Plaintiffs, despite claiming that the concern about wasteful spending was "pretext" for their release as Solicitor (<u>See</u> ECF 24 ⁋ 55), fully acknowledge that the Common $ense platform was premised upon reducing wasteful spending within the District. <u>See</u> Exhibit A, pgs. 41-42. A true copy of the transcript of Plaintiff Jerrold Sulcove's deposition has been attached to the corresponding motion as **Exhibit N**. <u>See</u> Exhibit N, pg. 24.

Within the local community, there was "overwhelming" public support for this change. <u>See</u> Exhibit G, pg. 163; Exhibit F, pg. 32.  Perhaps the main issue at the forefront of this community desire for change was the ongoing, time-consuming, and costly litigation involving the School District's Assistant Principal, Cathy Dusman, who was represented by attorney Jack Sharpe. <u>See</u> Exhibit A, pg. 100.  The Dusman litigation, which was extensively covered in local media, arose

due to an error in the contract drafted by Black & Davison which then lead to a total of four lawsuits against the District, due to that error. A true copy of the transcript of School District Superintendent Dr. Joseph Padasak's deposition has been attached to the corresponding motion as **Exhibit I**. See Exhibit I, pgs. 256, 272.

The seemingly endless litigation over the Dusman matters was perceived by the public to have been at the urging of Black & Davison in the face of untenable legal positions and mounting community opposition, such that it became a "hot button issue" during the 2015 primary election. See Exhibit G, pgs. 79-80, 174. Despite the Dusman defense eventually being covered by the District's Insurer, subject to a deductible, Plaintiffs billed a substantial amount of hours on the matter(s). True and correct copies of a sampling of Plaintiffs monthly billing statements relating to the Dusman litigation have been attached to the corresponding motion as **Exhibit P**.

Plaintiff Jan Sulcove, the main Plaintiff who performed solicitor duties for the School District on behalf of the Black & Davison firm (ECF 24, ⁋ 20), was not a supporter of the Common $ense agenda, equating them to the "Tea Party." See Exhibit A, pg. 42. Despite never previously censuring a board member during his 40+ year tenure as Solicitor, Jan Sulcove used his power as District Solicitor to recommend and prepare censures for Ed Norcross, Dr. Dana Baker, and Joan Smith, who were the nucleus of "Common $ense" even before it existed. See Exhibit A, pgs. 63-67.

The board members/seats which supported Jan Sulcove were up for reelection in 2015, which led to Mr. Sulcove's creation of the Citizens for the Value and Excellence in Education ("CVEE") PAC, which he openly and actively supported during the election as stated in Plaintiffs' Amended Complaint. See ECF 24, ⁋⁋ 39-43. The candidates who ran under the CVEE ticket in

2015 were Stanley Helman, Kim Amsley-Camp, Stephen Gaugler, and Darrel Snyder. See ECF, ¶ 36.  Mr. Sulcove, however, was not merely a supporter of CVEE, but its driving political force.

In addition to the activities listed within the Amended Complaint, in 2015, Mr. Sulcove also: **1)** Drafted press releases for CVEE; **2)** Prepared scripts for CVEE "phone-a-thon's";  **3)** Pursued "strategies" seeking to negatively affect the campaigns of Joan Smith, a member of Common $ense who was 1 of 10 individuals constituting the personal embodiment of Mr. Sulcove's client; **4)** Ghost wrote letters critical of current Common $ense board members intended for signature/endorsement  by community members; and, **5)** Performed background investigations into Common $ense candidates who were to likewise become the personal embodiment of his client in an attempt to disqualify their nominations. True and correct copies of communications evidencing the foregoing has been attached to the corresponding motion as **Exhibit J**. See Exhibit J.

In addition to being the driving force behind the CVEE campaign and agenda, Jan Sulcove also frequently intermingled his solicitor duties with his support for the CVEE agenda by: **1)** Using his official Black & Davison email account, which he used for Solicitor communications, to communicate with pro-CVEE District Members and employees about topics dealing solely with the upcoming election; **2)** Communicating solely with pro-CVEE Board members about District matters to the total and complete exclusion of Board members who supported the Common $ense agenda; **3)** Mixing his disdain for Common $ense associates within the performance of his duties as Solicitor and commentary to District management and CVEE Board members, going so far as to accuse opposing counsel in Dusman  and Common $ense supporter, Jack Sharpe, of fabricating evidence/lying and referring to Ed Norcross as a "dipshit."; and, **4)** Offering Black & Davison's Office and Notary services for use by the CVEE committee exclusively.  True and correct copies

of communications evidencing the foregoing have been attached to the corresponding motion as **Exhibit K**. See Exhibit K; See also Exhibit J.

Jan Sulcove knew that the Common $ense members were dissatisfied with Black & Davison's services as solicitor and he acknowledged that this contributed to the election being "hotly contested" from both sides of the political sphere. See Exhibit A, pg. 99.  This growing dissatisfaction with Black & Davison's performance in their role as District Solicitor is what led the Board, on March 25, 2015, in a 5-4 vote, to approve a Request for Solicitor Proposals from interested law firms.  A true and correct copy of the March 25, 2015 School Board meeting minutes has been attached to the corresponding motion as **Exhibit L**. See Exhibit L, at #11.03.

What were now Common $ense affiliated Board members Dr. Dana Baker, Carl Barton, Ed Norcross, and Joan Smith (along with Board Member Ann Boryan) voted to pursue the 2015 RFP. See Exhibit L, at #11.03.  CVEE Associates Robert Floyd, Stanley Helman, Phillip Miracle, and Kim Amsley-Camp voted against pursuing the 2015 RFP. See Exhibit L, at #11.03.  Per Jan Sulcove, the RFP process is supposed to be a secure, independent bidding process and the 2015 Chambersburg Area School District RFP was supposed to secure independent competitive bids for the District. See Exhibit A, pg. 175.

This is why, ostensibly, Black & Davison's involvement in the RFP process was, per Jan Sulcove, limited to receiving the initial RFP documents from the District for their input.  Sulcove indicated that Black & Davison had no communications with board members once their RFP was submitted and that Black & Davison did not prepare any sort of analysis of the RFP or commentary regarding alleged deficiencies in competitors' bids. See Exhibit A, pg. 180-187.  However, a review of Jan Sulcove's email communications (exclusively to his CVEE supporters) during this timeframe show a manipulation of the RFP process by Black & Davison which turned the RFP

into a predetermined sham designed by Black & Davison to maintain their role, and perceived birthright, as District Solicitor.  This is evidenced by:

    a.  Jan Sulcove emailing pro-CVEE board members and administration, detailing Black & Davison's planned RFP response before to the decision to even proceed with an RFP was voted on by the entire Board;

    b.  Drafting the RFP itself;

    c.  Discussing with his supporters on the Board (who were still a voting majority) and his supporters in District management the RFP submissions of the competing law firms and explaining why their bids were either not compliant with the RFP and/or why their bids were deficient in comparison to Black & Davison's;

    d.  Preparing a "comparison" of Black and Davison and fellow RFP finalist, CGA law firm, which was authored with an obvious slant, and then only providing that comparison to pro-CVEE board members and administration; and

    e.  Preparing a biased "question and answer" script to be used by his supporters on the Board during solicitor interviews in which Black & Davison was participating and specifically instructing his supporters on the Board to adopt it as their own and to not provide the script to the minority Board members who wanted Black & Davison removed as solicitor (e.g., Carl Barton, Ed Norcross, Joan Smith, and Dana Baker).

True and correct copies of communications evidencing the foregoing have been attached to the corresponding motion as **Exhibit M**. <u>See</u> Exhibit M.

As a result of this complete manipulation of the RFP for personal gain by Mr. Sulcove, which he denied ever occurred during his deposition, Black & Davison was approved as District Solicitor by a narrow 5-4 vote on May 27, 2015.  <u>See</u> Exhibit A, pgs. 180-184.  Eight days prior

to that board vote however, on May 19th, 2015, the Common $ense candidates *swept* the May primary election by wide margins, a clear affirmation that the public electorate rejected the status quo Board candidates and their "business as usual" policy agenda.

Contemporaneous with receiving a 5-4 vote to continue as solicitor, recognizing that the new incoming Board sought change that included replacing Black & Davison as Solicitor, Plaintiffs entered into the aforementioned written three year contract for solicitor services with the District which purported to include limitations on the new Board's right to terminate Black and Davison as Solicitor during those 3 years. See Exhibit G, pg. 146, 170; Exhibit C; Exhibit V, pgs. 119, 139.  This three year contract was agreed to by the 5 CVEE supporters on the Board, who would remain a majority until December 2015 when the new Board officially took office; and not only did the termination provision in the contract contravene Pennsylvania Law, it represented a "drastic" change in Solicitor renewal procedure. See generally id.

At the time that the three year contract was entered into, Plaintiffs were aware that the Common $ense board members were incoming and that the board majority who chose Black & Davison would be soon gone. See Exhibit A, pg. 297-298.  Despite knowing that a Solicitor does not have the authority to restrict the conditions under which a client may terminate the Attorney-Client relationship, Jan Sulcove prepared the termination provisions within the contract because he believed them to be acceptable. See Exhibit A, pgs. 96-97.

**Black & Davison's Release from Solicitor Duties**

As a result of the May primary election results, the Common $ense board members were formally elected in the November 2015 general election and were then formally sworn into their board positions in December 2015.  As of December 2015, the School Board now consisted of a pro-Common $ense majority, intending to effectuate their desired changes.  True to their campaign

promises, once the new school board took over in December 2015, measures were immediately taken to effectuate their plans to cut back on wasteful spending. See Exhibit A, pg. 41.

Shortly thereafter, on March 23, 2016, the new board, desiring a Solicitor who was not adversarial to them personally or their policy vision for the School District, as approved by the electorate, voted unanimously to discontinue solicitor services with Black & Davison. See Exhibit D, #10.01.  Interestingly, Robert Floyd, a CVEE constituent who voted for renewal in 2015, also voted to discontinue Black & Davison's solicitor services. See id.  This vote in March 2016 complied with the 90 day notice requirement within Black & Davison's Contract. See Exhibit C. As a result of their release from Solicitor duties, Plaintiffs filed the instant lawsuit alleging that their termination was a result of their "political affiliation" with, and support for, the CVEE ticket and that any concerns by the new board members about wasteful spending and deficient performance, though well documented in the years prior, were pretextual. See generally ECF 24. However, there are no genuine facts of record to support this assertion.

Superintendent, Dr. Joseph Padasak, who himself donated to the CVEE campaign, indicated that Plaintiffs' were released from their solicitor duties due to the current board's dissatisfaction with the quality, and cost, of legal services that Black & Davison were providing. See Exhibit I, pgs. 136, 189, 254.  Defendant Board Member Mark Schur indicated that his dissatisfaction with Black & Davison's legal counsel was formed as a member of the community prior to him being elected and did not change once he was elected into office. See Exhibit H, pg. 37.

Defendant Board Member Alex Sharpe indicated that the dissatisfaction he had with Black & Davison was not a product of paying too much money for legal fees, but rather, wasting money in legal fees due to Plaintiffs continually taking positions that were "wildly unpopular" with the

public and legally untenable. See Exhibit G, pgs. 65-67, 174.  This differentiation between cost and waste is key because the Board would support spending money on a case with public support and a tenable legal position, but the Common $ense members and the taxpayers were not supportive of the continual taking of untenable legal positions that did not have public support. See Exhibit G, pgs. 65-67.  As far back as 2013, well before any political behavior by Plaintiffs, Alex Sharpe did not trust Jan Sulcove's legal judgment, nor did he trust him professionally, which is why he lacked faith that Plaintiffs would be able to implement the change that the public and Common $ense sought. See Exhibit G, pg. 143, 163.

Defendant Board Member Dr. Dana Baker indicated that the District Solicitor position had been discussed for two years prior to 2015, well before any political activity by Plaintiffs. See Exhibit F, pg. 57.  Per Baker, the lack of confidence in Plaintiffs' ability to perform their Solicitor responsibilities was regularly discussed between himself, Joan Smith, Ed Norcross, and Carl Barton. See Exhibit F, pg. 57.  Baker did not have confidence in Black & Davison in the years leading up to the 2015 primary, due to Plaintiffs poor legal advice, which led to Baker wanting to part ways with Black & Davison. See Exhibit F, pg. 79.  Simply put, Baker did not believe Black & Davison to be a competent law firm and had voted against retaining them as solicitor on two occasions prior to March 2016.  His position in this regard was not based on political affiliation, but rather, Baker's belief that they were not a good representative of the School District. Exhibit F, pg. 87-88.

Defendant Carl Barton had numerous concerns regarding Black & Davison's performance, including omissions within incorrectly written contracts, such as the Dusman contract. See Exhibit Z, pgs. 16-17, 21.  Barton frequently made complaints regarding Plaintiffs' performance which included the wording of contracts, the Dusman "saga," encouraging a costly appeal to the Supreme

Court, and tax appeal cases which "drug out year after year." <u>See</u> Exhibit Z, pgs. 22, 24-25, 28.  In addition to performance concerns, Barton also disliked the relationships that Plaintiffs' fostered with Common $ense board members, often insulting them, by referring to himself as the "only one in the room with a law degree." <u>See</u> Exhibit Z, pg. 89.  It is for these reasons that Barton ultimately decided to vote to release Plaintiffs' from their role as solicitor. <u>See</u> Exhibit Z, pg. 89.

Defendant Board Member Joan Smith described herself as being "repulsed" by Jan Sulcove and that his practices made her "sick." <u>See</u> Exhibit V, pg. 108.  Per Smith, Jan Sulcove was "entitled" and "it was all about his own pocketbook" and how much money he could make from the District. <u>See</u> Exhibit V, pg. 119. It is for these reasons that as far back as 2012 well before any alleged "political affiliation" that Joan Smith believed Black & Davison should be removed as solicitor because she had no confidence in their ability. <u>See</u> Exhibit V, pgs. 134, 136, 137, 141.

Defendant Board Member William Lennartz voted to release Plaintiffs from their role as District Solicitor because of their "ineffectiveness," citing a backlog of reverse tax appeals, as well as receiving legal advice which he disagreed with. <u>See</u> Exhibit AA, pgs. 18-21.  Lennartz's decision to release Plaintiffs as District Solicitor had nothing to do with who Plaintiffs campaigned for. <u>See</u> Exhibit AA, pg. 38.  Defendant Board member Ed Norcross originally made a Board motion to replace Plaintiffs as Solicitor in 2014, prior to any campaign activity, because he was dissatisfied with their services and performance. <u>See</u> Exhibit W, pg. 42.  Norcross' motion to pursue a Solicitor RFP in 2015 had nothing to do with political activity, but rather because he continued to be dissatisfied with their services and performance. <u>See</u> Exhibit W, pg. 43.

Defendant Board member Robert Floyd, who voted to renew Black & Davison in 2015, voted to not renew their contract in 2016 because, over time, he became more familiar with their record and effectiveness.  True and correct copies of Robert Floyd's deposition transcripts have

been attached to the corresponding motion as **Exhibit X**. See Exhibit X, pgs. 11-13. Defendant Board Member, Kevin Mintz, who ran as an independent, also expressed the sentiment that the amount of money being spent on Black & Davison was "certainly part" of the decision to release Plaintiffs from their role as District Solicitor. See Exhibit O, pg. 27. Mintz, like Alex Sharpe, echoed that this concern was not based upon hourly rates or even specific billing statements, but rather the continuation of lawsuits that resulted in "constant billing" from Black & Davison. See Exhibit O, pg. 31. Mintz had frequently advocated for bringing the Solicitor position in-house as a way to save money. See Exhibit O, pgs. 47-48, 51.

Expert John Freund, in reviewing these concerns related to Black & Davison's performance and billing practices states that "there were bona fide reasons outside of Black & Davison's affiliation with CVEE candidates" that gave Defendants the right to replace Black & Davison as School Solicitor. See Exhibit Y. Even Plaintiff Jan Sulcove, when questioned during his deposition, could not state specific facts as to why Plaintiffs were released from their role as solicitor and, accordingly, the specific factual  basis for Plaintiffs' claims within their amended complaint. See Exhibit A, pgs. 433-438.

The only "evidence" adduced during discovery which alleged that Plaintiffs were fired for their political affiliation came in the form of two rote affidavits ostensibly authored by CVEE-supporters Stanley Helman and Phillip Miracle. These affidavits, which parroted specific allegations from Plaintiff's Amended Complaint are completely unsubstantiated by any facts of record. True and correct copies of those affidavits, along with communications from defense counsel requesting that any such further witnesses be identified in advance of the fact discovery deadline, have been attached to the corresponding motion collectively as **Exhibit Q**.

These "sham affidavits" which were provided on the very last day of fact discovery and identify trial witnesses that Plaintiffs refused to identify prior (despite multiple previous inquiries so that their depositions could be taken), do nothing to create any issues of fact due to their generic reiteration of the Amended Complaint's allegations and complete lack of foundational support anywhere else in the record.  The affidavits were provided for the sole purpose of defeating summary judgment arguments, have no foundational support anywhere else in the record, and for these reasons, create no *genuine* issues of material fact as to whether Plaintiffs' "political affiliation"  was the reason why their contract was not renewed (respectfully, under the totality of the record evidencing the way Jan Sulcove conducted his role as the District's solicitor, even if it is believed that there is a question of whether Plaintiffs were terminated for political reasons, which is denied, Defendants are nonetheless entitled to summary judgment).

What was supported throughout the entirety of the record, however, were the assertions that Black & Davison were released from their role as District Solicitor due to overwhelming opposition to their wasteful spending practices and deficient legal acumen.  In addition to CVEE supporters, Common $ense supporters, and independent candidates all giving extensive sworn deposition testimony on the reasons the new Board released  Plaintiffs from their role as Solicitor, there are contemporaneous email communications during the timeframe reflecting dissatisfaction with Black & Davison's legal practices and unsatisfactory performance. True and Correct copies of these communications have been attached to the corresponding motion as **Exhibit R**.

As can be seen, these contemporaneous communications leading up to the election show a dissatisfaction with Plaintiffs' legal services from Common $ense members, community members, opposing counsel,  and even CVEE supporters Sylvia Rockwood and Billy Hodge who acknowledge that Plaintiffs' practices centered around their financial gain. See Exhibit R.

Plaintiffs also allege that an improper basis for their release from their position as solicitor was further evidenced by Defendants "purging" the School District of CVEE supporters by targeting District employees Sylvia Rockwood, Burdette Chapel, and Kevin Weller. See ECF 24, ¶¶ 47-49.   However, Plaintiff Jan Sulcove could cite no evidence during his deposition which supported that Rockwood, Chapel, or Weller were released due to their support of CVEE. See Exhibit A, pgs. 121-124; See also Exhibit I, pgs. 181, 248 (Rockwood left due to receiving an offer from the Carlisle Hospital and Chapel was considered a "lightning rod" who refused to abide by his supervisor).

Further, contemporaneous email communications during this time show that Rockwood was actively looking for a new position months before her resignation, Chapel voluntarily retired in the face of intense criticism of his job performance, and Weller voluntarily resigned for retirement purposes. True and correct copies of these correspondences have been attached to the corresponding motion as **Exhibit S**.

Although the manner in which Jan Sulcove conducted himself as Solicitor clearly made political affiliation an appropriate consideration for the position, Plaintiffs release from their role as District Solicitor was due to a longstanding desire for change to the practices championed by Plaintiffs.   Clearly, Joan Smith, Ed Norcross and Dr. Baker did not hold Jan Sulcove in high personal regard because he insulted them, isolated them, censured them, and mocked them.  This would be justification enough for a client to terminate their legal counsel and on a personal level, is a far more compelling reason for termination of legal counsel than his or her political affiliation.

As such, Defendants respectfully assert that the grant of summary judgment is appropriate because no genuine issues of material fact exist that Plaintiffs were relieved of their duties as solicitor because of their political affiliation, regardless of the fact that the role of Solicitor for the

Chambersburg Area School District in 2013-2015 was a policymaking position and regardless that the individual Defendants are entitled to qualified immunity.

III.     **STATEMENTS OF QUESTIONS INVOLVED**

**a.** **Should this Honorable Court Grant Defendants' Motion for Summary Judgment in favor of all Defendants because there are no genuine issues of material fact regarding whether Plaintiffs were released from their role as District Solicitor for impermissible reasons?**

**Suggested Answer**: In the affirmative.

**b.** **Should this Honorable Court Grant Defendants' Motion for Summary Judgment in favor of the individual Defendants because there are no genuine issues of material fact suggesting defendants are not entitled to qualified immunity?**

**Suggested Answer**: In the affirmative.

**c.** **Should this Honorable Court Grant Defendants' Motion for Summary Judgment in favor of all Defendants because First Amendment considerations do not apply to Plaintiffs role as District Solicitor due to the inherent policymaking nature of the position?**

**Suggested Answer**: In the affirmative.

**d.** **Should this Honorable Court Grant Defendants' Motion for Summary Judgment in favor of Defendant Ed Norcross because he was not present for, and did not participate in the vote to release Plaintiffs from their role as District Solicitor?**

**Suggested Answer**: In the affirmative.

**e.** **Should this Honorable Court Grant Defendants' Motion for Summary Judgment in favor the Defendant School District because there are no facts of record which support CASD developing and/or maintaining deficient policies and/or customs which caused the deprivation of Plaintiffs' constitutional rights?**

**Suggested Answer**: In the affirmative.

IV.   **LEGAL ARGUMENTS**

**Summary Judgment**

Federal Rule of Civil Procedure 56 allows a District Court to enter summary judgment upon motion is "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The general standard for summary judgment has been set forth, as follows:

> Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A factual dispute is material if it might affect the outcome of the suit under the applicable law. A factual dispute is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. The evidence presented must be viewed in the light most favorable to the non-moving party. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.
>
> DeWees v. Haste, 620 F. Supp. 2d 625, 629 (M.D. Pa. 2009) (internal quotations, quotation marks, and citations omitted), aff'd, 386 F. App'x 133 (3d Cir. 2010).

When moving for summary judgment, it is the Defendant's burden to show that the Plaintiff has failed to establish an essential element of their claim. Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d. Cir. 2014).  While a court must view the evidence in the light most favorable to the non-moving party with the benefit of all reasonable inferences drawn from that evidence, such inferences must flow directly from admissible evidence and an inference based upon speculation/conjecture will not create a material fact sufficient to defeat summary judgment. See Id.

When considering affidavits in the context of summary judgment, the Third Circuit has posited that the term "'genuine issue,' rather than any issue of fact" demonstrates the necessity to

scrutinize affidavits as "a means of sorting the wheat from the chaff." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d. Cir. 2007).  This scrutiny of affidavits, commonly referred to as the "Sham Affidavit Doctrine" defines a "sham" affidavit as "a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story *or is willing to offer a statement solely for the purpose of defeating summary judgment*." Id. (emphasis added).

Part of the rationale for an increased scrutiny of affidavits in the context of summary judgment is that affiants and their affidavits are not subjected to cross-examination as one would be during a deposition, and hence, do not carry the increased level of reliability that is a natural byproduct of the deposition/cross-examination process. Id.  Rather, affidavits "are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible." Id.  As such, when presented with a questionable affidavit, the Third Circuit requires that there be independent evidence on the record to bolster the assertions within the affidavit, otherwise, it is appropriate to disregard the affidavit as a "sham" and, therefore, does not create an impediment to the granting of summary judgment. See Id., pg. 254; See also Baer v. Chase, 392 F.3d 609, 625-626 (3d. Cir. 2004).

When it is clear that "an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." Jiminez, 503 F.3d at 253; See also EBC, Inc. v. Clark Bldg. Sys., 618 F.3d 253, 269 (3d. Cir. 2010); Doherty v. Allstate Indem. Co., 734 Fed. Appx. 817, 823 (3d. Cir. 2018).

**a. Defendants are entitled to Summary Judgment because there are no genuine issues of material fact regarding whether Plaintiffs were released from their role as District Solicitor for impermissible reasons.**

Fact discovery has shown that there are no genuine issues of material fact on whether Plaintiffs' were relieved of their position as District Solicitor because of their political activities/affiliation in the 2015 election. Within their amended complaint, Plaintiffs allege that they were released from their role as District Solicitor due to their support of the CVEE faction, and thus, their First Amendment rights were infringed upon. See ECF No. 24, ¶¶ 47, 71, 72, 75, 76.

Although fact discovery unequivocally established that for different Board members there were different reasons for Plaintiffs' discharge, there is no credible evidence that any Board member voted to remove Black & Davison as District Solicitor because of the law firm's political patronage/activities.  Clearly, Jan Sulcove had created personal issues with Dr. Baker, Joan Smith, and Ed Norcross to curry favor with the then majority of the Board through his disparaging emails about these individuals and his isolation of them on the board.  This is reason enough for these Board members to want a new Solicitor at the first opportunity.

Further, it is clear that the new board members campaigned on a platform of putting an end to "business as usual" (which would include Black & Davison as Solicitor after 40 years) and a desire to change to the District's litigation practices and a growing concern regarding the quality of legal services provided by Plaintiffs.  There are no genuine issues of fact to the contrary.  Despite claiming that the desire to save money on wasteful spending was "pretext" for Plaintiffs' release, per Plaintiff Jan Sulcove's own testimony, the discussion to change the overall direction of the School District centered on wasteful spending. See Exhibit A, pg. 41; See also Exhibit N, pg. 24.

This desire to cut wasteful spending, again per Jan Sulcove's own testimony, began years before the 2015 primary election with various other groups, such as the "Concerned Citizens Group" lobbying for the same change. See Exhibit A, pg. 44.  The early genesis of the Common

$ense movement, which adopted the same desire for change illustrated by previous groups, began with Defendants Carl Barton and Joan Smith (in 2011) being elected to the School Board. See Exhibit A, pg. 41-44.

In addition to the growing movement within the District to combat wasteful spending, per Jan Sulcove, there was similar mounting dissatisfaction with Plaintiffs' performance of their solicitor duties. See Exhibit A, pg. 69. Due to their performance, Plaintiffs role as District Solicitor had been discussed for two years prior to 2015 between then minority board members Smith, Norcross, Baker, & Barton. See Exhibit F, pg. 57.

Plaintiffs were "enmeshed" with the status quo of wasteful spending, due to their long-tenured role as Solicitor. See Exhibit V, pgs. 21-22, 108. Despite claiming that their release was politically motivated, the March 26, 2014 Board vote on whether or not to pursue a solicitor RFP in 2014, a full year before Plaintiffs engaged in any sort of political activity, clearly evidences the contrary. See Exhibit B at #6.05; Exhibit G, pg. 166. Further, the contemporaneous email communications from the years leading up to the election both evidence and confirm these concerns on behalf of Common $ense members, community members, opposing counsel,  and even CVEE supporters (Sylvia Rockwood and Billy Hodge). See Exhibit R.

All of the Defendants maintained to one degree or another that their individual reasons for wanting to remove Black & Davison involved bad advice that led to waste, questions over competency, lack of confidence, lack of trust, and the Dusman litigation. For the Board members who had served as the minority under Mr. Sulcove's solicitorship, their reasons also included offense taken by the way they had been treated/isolated/censured/mocked them. See, e.g., Exhibit V, pgs. 19, 77, 90; Exhibit Z, pg. 89. The testimony and paper record is replete with references to these considerations being the reason the different Board members wanted to remove Black &

Davsion in 2016 and each one of them is an acceptable reason (e.g., a non-actionable reason for a client terminating its attorney).

Dr. Joseph Padasak, who himself donated to the CVEE campaign, indicated that Plaintiffs' were released from their solicitor duties due to the current board's dissatisfaction with the quality, and cost, of legal services that Black & Davison were providing. See Exhibit I, pgs. 136, 189, 254. Defendant Mark Schur's decision to release Plaintiffs  was a continuation of his dissatisfaction with Black & Davison's legal counsel that was formed well in advance of his decision to run for the School Board, prior to Plaintiffs' engaging in political behavior. See Exhibit H, pg. 37. Defendant Alex Sharpe's decision to release Plaintiffs was the result of not trusting Jan Sulcove's legal judgment and professionalism from as far back as 2013 and, hence, Sharpe lacked faith that Plaintiffs would be able to implement the change that the public and Common $ense sought. See Exhibit G, pg. 143, 163.

Defendant Dana Baker indicated that the District Solicitor position had been discussed for two years prior to 2015, also well before any political activity by Plaintiffs, and that he did not have confidence in Black & Davison in the years leading up to the 2015 primary, due to Plaintiffs poor legal advice, which led to Baker wanting to part ways with Black & Davison. See Exhibit F, pg. 57, 79.  Defendant Carl Barton stated that his decision to vote to release Plaintiffs from their role as District Solicitor pertained to "numerous" complaints he had regarding their performance, as well as, the poor rapport that Black & Davison fostered with certain board members due to insulting them by frequently referring to himself as being the only individual with a law degree. See Exhibit Z, pgs. 16-25, 89.

Defendant Bill Lennartz's decision to release Plaintiffs from their role as Solicitor was due to Plaintiffs' "ineffectiveness" due to a backlog of reverse tax appeals, as well as, receiving legal

advice which he disagreed with and, accordingly, had nothing to do with who Plaintiffs supported politically. See Exhibit AA, pgs. 18-21, 38.  Defendant Joan Smith indicated that her decision to release Black & Davison had absolutely nothing to do with political behavior, but rather, her having no faith in their ability from as far back as 2012 due to her being routinely belittled by Jan Sulcove leading to a lack of trust and discontent with their wasteful practices and being focused on their own "pocketbook." See Exhibit V, pgs. 77, 100, 109, 119, 134, 136, 137, 141.

Defendant Robert Floyd actually voted to renew Black & Davison in 2015, but decided to release Plaintiffs from their role as District Solicitor in 2016, not for political motivations, but because he became more familiar with their overall record and effectiveness, citing their handling of the Dusman matters, as well as, their propensity to allow tax appeals to "drag on." See Exhibit X, pgs. 11-12, 14, 23.  Defendant Kevin Mintz, despite running as an independent, indicated that the decision to release Black & Davison was influenced by concern regarding the amount of money being spent on Black & Davison, the continuation of lawsuits that resulted in "constant billing" from Black & Davison, and his desire to move the position in-house. See Exhibit O, pgs. 27, 31, 47-48, 51.

These bona fide concerns about Black & Davison's performance and billing practices gave Defendants the right to replace Black & Davison as School District Solicitor, according to John Freund, an undisputed expert in this area of the law.  See Exhibit Y.  Even Plaintiff Jan Sulcove himself, when questioned during his deposition, could not state definitive and genuine facts as to why Plaintiffs were released from their role as solicitor and, accordingly, the specific factual basis for Plaintiffs claims within their amended complaint. See Exhibit A, pgs. 433-438.

Plaintiffs' assertion within their amended complaint that the Defendants "purged" the School District of CVEE supporters by targeting Sylvia Rockwood, Burdette Chapel, and Kevin

Weller is also completely unsubstantiated by the record. <u>See</u> ECF 24, ¶¶ 47-49.  Plaintiff Jan Sulcove could cite no evidence during his deposition which supported that Rockwood, Chapel, or Weller were released due to their support of CVEE. <u>See</u> Exhibit A, pgs. 121-124; <u>See also</u> Exhibit I, pgs. 181, 248 (Rockwood left due to receiving an offer from the Carlisle Hospital and Chapel was considered a "lightning rod" who refused to abide by his supervisor); Exhibit S.

The only alleged "facts" which exist on the record to support Plaintiffs being released from their role as District Solicitor are contained within the two sham affidavits, provided on the last day of fact discovery and identifying two additional fact witnesses whose identities were previously requested multiple times. <u>See</u> Exhibit Q.

A reading of these affidavits makes it clear that they were authored by Counsel, for the sole purpose of attempting to overcome summary judgment. <u>See</u> Exhibit Q.  Further, the safeguards against such concerns, which would have been the opportunity to cross-examine the affiants during a deposition could not occur because Plaintiffs' Counsel previously ignored all such requests to identify and depose such witnesses.[2] <u>See</u> Exhibit Q.  Accordingly, these affidavits are the very definition of "sham affidavits" under the analysis set forth by the Third Circuit in <u>Jiminez</u>, 503 F.3d, and the Court should rightfully disregard these affidavits as the "sham" that they are because they create no *genuine* issues of fact. <u>See</u> <u>Id.</u> (court discussing the necessity to scrutinize affidavits as "a means of sorting the wheat from the chaff when deciding whether *genuine* issues of fact exist).

What fact discovery did actually establish, however, is that Plaintiffs' release from their role of District Solicitor was the result of a longstanding desire for change regarding the District's

---

[2] Even though Plaintiffs' Counsel will claim that they offered to have Helman and Miracle be deposed after the factual discovery deadline, such would have proven highly problematic given the summary judgment deadline. As it were, the transcripts from the depositions of several defendants were received only two days before the Summary Judgment deadline.

wasteful financial practices along with a dissatisfaction with Plaintiffs' legal services.  These reasons were not mere pretext concocted by Defendants as a cover, but rather are embedded in the record as a process that took several years to change "business as usual" within the Chambersburg Area School District, of which Black & Davison was irreversibly intertwined.

This movement was later embodied by the Candidates for Common $ense who began to implement their change shortly after being sworn into their roles as board members.  Part of that change was necessarily parting ways with Black & Davison who themselves embodied wasteful practices and unsatisfactory legal performance and were "enmeshed" with business as usual. There are no genuine issues of material fact regarding the reasons why Black & Davison were released from their role because, as has been demonstrated, Common $ense members, the District Superintendent, CVEE members, and even Plaintiffs' themselves all acknowledged the public's desire for change within the District which culminated in a landslide victory for this change.

There are no genuine facts of record that have been established during fact discovery which supports the contention that Plaintiffs were terminated for their support of the CVEE ticket, let alone facts of record which support that Plaintiffs, as required under the germane law, were dismissed *solely* based on their partisan political affiliation. See Ness v. Marshall, 660 F.2d 517, 520 (3d. Cir. 1981); See also Branti v. Finkel, 445 U.S. 507, 516 (1980) (First Amendment protections apply when an individual's political beliefs are "***the sole basis for depriving him of continued employment***") (emphasis added); Elrod v.Burns, 427 U.S. 347 (1976); Zold v. Mantua, 935 F.3d 633, 635 (3d. Cir. 1991) ("[a] nonpolicymaking, nonconfidential government employee" cannot be discharged on the ***sole ground*** of his or her political beliefs.") (emphasis added).

Any finding that Plaintiffs' were released for political reasons would be rooted in pure speculation and conjecture because the evidence is so one-sided that Defendants must prevail as a

matter of law.   Accordingly, Defendants respectfully request that this Honorable court grant Summary Judgment in favor of all Defendants and dismiss all of Plaintiffs' claims with prejudice.

**b.  Defendants are entitled to Summary Judgment because there are no genuine issues of material fact suggesting Defendants are not entitled to qualified immunity.**

The doctrine of qualified immunity provides that government officials "performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982).  Qualified immunity is an "entitlement" that represents "an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (Pa. 1985).  The entitlement is "effectively lost" if a case is erroneously permitted to go to trial. See id.

It is for this reason that the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation." Curley v. Klem, 298 F.3d 271, 277 (3d. Cir. 2002).  The issue of qualified immunity should not be routinely submitted to the jury, but rather, "should be decided by the court long before trial." Hunter v. Bryant, 502 U.S. 224, 228 (1991).  The doctrine of qualified immunity is an "accommodation of competing values," that allows a plaintiff to recover when the government actor's actions are "plainly incompetent or knowingly violated the law," but a state officer who makes a reasonable mistake about the legal constraints of his actions is immunized from suit." Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted).

To avoid qualified immunity, an individual must take actions under the color of state law, and the individual must violate a right that is "so clearly established that any reasonable officer would have known of it... [The analysis of whether the right was so clearly established] 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" George

v. Rehiel, 738 F.3d 562, 572 (3d Cir. 2013) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004).  Moreover, "[b]ecause a government official may only be held personally liable under Bivens 'for his or her own misconduct,' the plaintiff must allege that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" George, 738 F.3d, at 572 (citing Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)).

To overcome qualified immunity, a plaintiff must establish that "each individual … defendant (1) violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" Ashcroft v. Al-Kidd, 563 U.S. 731, 735 (2011). However, the court need not undertake its inquiry in that order. Pearson v. Callahan, 129 S. Ct. 808 (2009). Id.  For a right to be considered clearly established, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" and the unlawfulness of that behavior "must be apparent." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal citations omitted).

When considering whether a clearly established right has been infringed upon, a Defendant is entitled to a "fair notice" that their conduct deprived the other of a constitutional right. See Hope, 536 U.S., at 739-740; See also United States v. Lanier, 520 U.S. 259 (1997) (defendants are entitled to a "fair warning" that their conduct deprives one of a constitutional right).  Thus, when pursuing Summary Judgment based upon the doctrine of qualified immunity, a Defendant can either show that they did not violate Plaintiffs' constitutional rights as asserted or that reasonable officers could not have known that their conduct constituted such a violation when the alleged violation occurred. See Halsey v. Pfeiffer, 750 F.3d 273, 288 (3d. Cir. 2014).

In the instant matter, in order for Defendants not to be afforded qualified immunity, fact discovery would have had to produce facts which established that it was "clearly established" in

the specific context of this case that the Solicitor for the Chambersburg Area School District could engage in unfettered political patronage and, as such, it was clearly established to a reasonable board member that political affiliation was not a requirement for this particular solicitor position. Fact discovery revealed the opposite insofar as Mr. Sulcove "politicized" the position of solicitor by virtue of his very close "affiliation" with certain individuals (the 2013-14 majority Board members) such that no reasonable Board member could think it was "clearly established" that such an affiliation was not a requirement of this particular solicitorship – at least if the Board member wanted the Solicitor to faithfully implement their agenda.

There are no facts from which to conclude that the Defendant Board members appreciated and/or distinguished that these activities were undertaken by Mr. Sulcove in his personal capacity as opposed to as Solicitor for the School District – he was campaigning for the School Board election, often using his law firm to do so.  In addition to the political activities which Plaintiffs readily admit within their complaint (see ECF No. 24, ¶¶ 38-43), fact discovery has revealed that, leading up to the 2015 election, the solicitorship and political activity were intertwined as one, all due to Plaintiffs' behavior.

Plaintiffs unabashedly used their position and powers as solicitor for the School District to the detriment of Common $ense members.  Despite never censuring a board member during his 40+ year tenure as Solicitor, Jan Sulcove used his power as District Solicitor to prepare censures for Common $ense supporters Ed Norcross, Dana Baker, and Joan Smith, in the months/years leading up to the primary election. See Exhibit A, pgs. 63-67.  Sulcove also aimed to limit the Common $ense agenda through his policymaking powers. See Exhibit T.

Whether it accusing Defendant Alex Sharpe of defamation and inquiring with the Superintendent whether to pursue legal recourse against Sharpe, interweaving his disdain for

Common $ense supporter Jack Sharpe into his legal advice or limiting meetings and/or emails solely to CVEE supporters, Jan Sulcove was not shy about his political leanings while executing his role as Solicitor. <u>See</u> Exhibit K.  Further, Sulcove openly mocked, and warned against, Common $ense supporters, referring to Ed Norcross as a "dipshit" who is "off [his] medications," Dana Baker as a "coward," and advised that "<u>extreme caution is the watchword of the day in every decision involving potential new board members.</u>" <u>See</u> Exhibit K.

In addition, and as shown in Exhibit J, Jan Sulcove frequently intertwined his CVEE allegiance with his official Black & Davison capacity by communicating about CVEE  to CVEE supporters on his official Black & Davison email account, holding CVEE events at Black & Davison's Office, and availing Black & Davison's services to CVEE members. <u>See</u> Exhibit J. Further, Jan Sulcove prepared derogatory letters about Joan Smith, a member of his current board client, for community publication, all in an effort to advance the CVEE agenda. <u>See</u> Exhibit J.

Perhaps the most egregious display of politicizing this solicitorship was Jan Sulcove's complete manipulation of the 2015 Solicitor RFP process which, per Sulcove, was supposed to be "secure and independent." Exhibit A, pg. 175.  As shown within Exhibit M, Jan Sulcove provided communications and clearly biased materials specifically to CVEE board members which were strategically designed to give Black & Davison an advantage in the RFP process. <u>See</u> Exhibit M. This access was unavailable to other RFP firm respondents and Sulcove specifically directed that CVEE members should adopt his materials as their own and that the materials specifically be withheld Common $ense members. <u>See</u> Exhibit M.  Sulcove turned the objective RFP process into little more than a pre-determined sham by utilizing his political affiliations for strategic advantage.

Despite his own communications showing otherwise, Sulcove denied ever partaking in such behavior during his deposition.[3] See Exhibit A, pgs. 180-184.

As the foregoing demonstrates, Plaintiffs politicized the role of Solicitor for the Chambersburg Area School District such that political affiliation permeated the role of Solicitor from Solicitor selection through execution of Solicitor duties.  There are no genuine issues of material fact regarding Defendants being entitled to qualified immunity because no reasonable board member would look at the Mr. Sulcove's conduct and believe it "clearly established" that political affiliation was not a necessary component to the position of District Solicitor.

Surely, a reasonable board member who considered the extent of Plaintiff's politicization and thought that political affiliation was a pertinent consideration for this particular solicitorship would not be thought to be "plainly incompetent" or "knowingly violating" the law, as required by Curley, 499 F.3d at 206-07; See also Hope, 536 U.S. at 739 (the unlawfulness "must be apparent" to a reasonable official).

Rather, looking at this particular set of facts and the extent that Plaintiffs allows their political belief to permeate their performance as Solicitor, thinking that political affiliation was a pertinent consideration for the solicitor would be both rational and expected.  At the very least, Plaintiffs' behavior muddies the water on whether political affiliation was an appropriate consideration in a way that it cannot be considered "clearly established."  Further, there are no facts of record which established that the Defendants had "fair notice" or "fair warning" that their conduct deprived Plaintiffs of their alleged constitutional right to engage in unfettered political patronage, as required by Hope, 536 U.S., at 739-740 and Lanier, 520 U.S.

---

[3] Immediately prior to being impeached on these communications, however, Jan Sulcove abruptly left his deposition. See Exhibit A, pg. 476-480.

Plaintiffs obvious and arrogant intermingling of their political leanings into their solicitor performance and the "independent" Solicitor RFP process make the determination of qualified immunity entirely inappropriate to submit for jury considering given the established facts of this particular solicitorship. See Curley v. Klem, 298 F.3d 271, 277 (3d. Cir. 2002) (qualified immunity should be resolved at the earliest possible stages of litigation); Hunter v. Bryant, 502 U.S. 224, 228 (1991) (The issue of qualified immunity should not be routinely submitted to the jury, but rather, "should be decided by the court long before trial.").   Accordingly, Summary Judgment should be awarded to the Defendant Board members because there is no question that they are entitled to qualified immunity under the facts and circumstances of this case.

   c. **Defendants are entitled to Summary Judgment because First Amendment considerations do not apply to Plaintiffs role as District Solicitor due to the inherent policymaking nature of the position.**

The dismissal of public employees solely based on their partisan political affiliation has been held to infringe upon first amendment rights of belief and association. See Ness v. Marshall, 660 F.2d 517, 520 (3d. Cir. 1981); See also Branti v. Finkel, 445 U.S. 507, 516 (1980) (First Amendment protections apply when an individual's political beliefs are "the sole basis for depriving him of continued employment"); Elrod v. Burns, 427 U.S. 347 (1976).   However, patronage dismissals of employees in policymaking positions has been deemed by the Courts to be not actionable. See Elrod, 427 U.S. at 367.

When determining whether a position is considered to be policymaking in nature, thus making a patronage dismissal appropriate, the courts will generally consider whether such employees: 1) Act as advisers, 2) Formulate plans for implementing broad goals, and/or 3) Have a broad scope of responsibilities. See Ness, 660 F.2d at 520 (citing Elrod, 427 U.S. at 368).   In refining the Elrod factors, the Court observed that ""the ultimate inquiry is not whether the label

of 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti v. Finkel, 445 U.S. 507, 518 (1980).

This inquiry is "inherently fact specific" and requires the court to examine the nature/responsibilities of the job at issue, along with the functions of the public office in question and not the actual past duties of the employee(s) involved. See Wetzel v. Tucker, 139 F.3d 380, 383-384 (3d. Cir. 1998). The Elrod and Branti analysis has been called a "functional analysis" by the Third Circuit and, under the same, patronage dismissals have been held to not offend the First Amendment where a difference in party affiliation will "be highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office." Ness, 660 F.2d at 521.

Moreover, the Third Circuit has held that in situations where boards rely upon Counsel to assess legal situations and give attendant advice, due to the close relation between political ramifications and legal advice, such boards have a right to have the assurance that the Solicitor share the same political ideology as the board and "[t]hese situations are exactly the types for which the Supreme Court created the Elrod/Branti exception." See Wetzel, 139 F.3d at 386; See also Ness, 660 F.2d at 522 (in relying upon an attorney to render legal opinions which are related to policy, a party "has the right to receive the complete cooperation and loyalty of a trusted adviser, and should not be expected to settle for less.").

Here, fact discovery has established Plaintiffs' role as District Solicitor was comprised of advising and policymaking across a broad range of topics and the implementation of the Board's agenda and vision. To begin, Plaintiff Jan Sulcove admits that, with regard to the advice provided by Plaintiffs, one such use for that advice was to develop policy based upon the advice provided. See Exhibit A, pg. 235. Mr. Sulcove's position as solicitor required Plaintiffs to advise and prepare

policy on issues ranging from First Amendment Confederate Flag issues to School Board Code of Conduct issues. See Exhibit T.

Due to the breadth of topics covered by Plaintiffs' advice, as well as, their involvement in every stage of policymaking, Plaintiffs role as Solicitor established Plaintiffs as an essential figure in formulating plans for implementing broad goals for the District.  However, Plaintiffs were not just an integral part of policymaking, but they took it a step further by politicizing their policymaking, often preparing advice and policies aimed to silence/curtail the Common $ense members and agenda.  Plaintiff Jan Sulcove prepared policies to "emasculate" Alex Sharpe's proposed resolution, he prepared motions to regulate/curtail Ed Norcross, and he prepared policies which needed to be "toned down" because "vague generalities may not make the point with a board member or two." See Exhibit T.

Perhaps most telling is that the very RFP that Plaintiffs' three year contract was prepared in response to explicitly states that, among other broad responsibilities, advising and policymaking is a requirement of the job. A true and correct copy of the Solicitor RFP from 2015 has been attached to the corresponding motion as **Exhibit BB.** See Exhibit BB, at 3.2.11 & 3.2.10.

As seen from the scope of services included with the RFP, Plaintiffs' role as District Solicitor involved them advising on a broad scope of policy matters which necessarily resulted in the formulation and implementation of board district goals, which under Elrod, shows that this particular solicitorship would be considered a "policymaking" position.  Further, there was a clear philosophical division between the Common $ense board members and Plaintiffs.  The Common $ense board members did not have faith that Plaintiffs would be able to implement the change that Common $ense sought. See, e.g. Exhibit G, pgs. 143, 163; Exhibit F, pgs. 87-88; Exhibit V, pgs. 134, 136, 137, 141.

Plaintiffs were responsible for advising and policymaking across a broad spectrum of topics and often used those powers to curtail the change sought by Common $ense members, even after they were sworn into office. See Exhibit T. Party affiliation was an appropriate requirement for the effective performance of Plaintiffs role as solicitor, as required by Branti, 445 U.S. at 518, because Plaintiffs actively used their role and powers as Solicitors to undermine the Common $ense agenda.  When looking at the nature/responsibilities of this particular solicitorship, as required by Wetzel, 139 F.3d at 383-384, it shows the paradigmatic example of why the Elrod and Branti exception exists.

The Chambersburg Area School District relied upon their Solicitor to assess legal situations, provide legal advice, represent its interests in legal proceedings in various forums and executed District policy as dictated by the current Board (not one from 5 years ago).  Therefore, the Board had the right to have as its solicitor a firm which shared its vision, objectives and affiliation so as to effectuate their desired change mandated by popular vote. See Wetzel, 139 F.3d at 386; See also Ness, 660 F.2d at 522 (in relying upon an attorney to render legal opinions which are related to policy, a party "has the right to receive the complete cooperation and loyalty of a trusted adviser, and should not be expected to settle for less.").

Likewise, the Board has the right to be assured that the solicitor working for it will not act to subvert its goals and intended direction.  How can it be said that Plaintiffs could effectively carry out the Common $ense Board's agenda when they actively and frequently used their Solicitor powers to undermine that agenda?  As is documented, Jan Sulcove openly targeted the Common $ense agenda as a whole, as well as, personally targeted its board members, making party affiliation an appropriate requirement for this solicitorship.

Furthering this rationale, due to the importance of the role of solicitor in implementing board policy, expert John Freund opines that the majority of the board having confidence in the representation of their solicitor is "an absolutely necessary qualification for the effective performance of the Solicitor's duties." See Exhibit Y, ⸗ 31.  Like in Wetzel and Ness, where summary judgment was granted because first amendment protections were deemed to not apply to particular solicitor positions for similar reasons, Defendants in the instant matter had the right to have a Solicitor whom they could trust to effectuate their change, rather than one who actively worked to oppose and undermine their agenda through their policymaking powers.

Accordingly, the Elrod/Branti exception applies in this scenario because reasonable minds cannot differ on the fact that Plaintiffs were heavily involved in District policymaking across a wide spectrum of topics and used their policymaking powers to limit Defendants both prior to, and after, the new board assuming power.

**d. Defendant Ed Norcross is entitled to summary judgment because he was not present for, and did not participate in the vote to release Plaintiffs from their role as District Solicitor.**

Within Plaintiffs' Amended Complaint, it is alleged that "[a]ll of the individual defendants on the board voted for termination." See ECF No. 24 ⸗ 51.  However, Defendant Ed Norcross was not present for and did not participate in this vote. See at Roll Call & #10.01; Exhibit W, infra, pgs. 39, 44.  Accordingly, Defendant Ed Norcross is also entitled to summary judgment because he did not participate in the vote which serves as the basis for Plaintiffs' First Amendment claims.

**e. Defendant Chambersburg Area School District is entitled to summary judgment because there are no facts of record which support CASD developing and/or maintaining deficient policies and/or customs which caused the deprivation of Plaintiffs' constitutional rights.**

Within Plaintiffs' amended complaint, it is alleged that "Defendant CASD developed and maintained a number of deficient policies and/or customs which caused the deprivation of

Plaintiffs' constitutional rights." See ECF No. 24 ¶ 75.   However, fact discovery has not established that any such policies and/or customs ever existed.   Plaintiffs served as District Solicitor for forty-plus years and would have been the party responsibility for preparing any such policies and/or customs, yet to Defendants' knowledge, no such claims have ever been made prior to the instant matter.

Plaintiffs also allege that their release from their position as solicitor was further evidenced by Defendants "purging" the School District of CVEE supporters by targeting District employees Sylvia Rockwood, Burdette Chapel, and Kevin Weller. See ECF 24, ¶¶ 47-49.   Such allegations would be the germane allegations to establishing the policies or customs alleged against the District in Plaintiffs' Amended Complaint.   However, Plaintiff Jan Sulcove could cite no evidence during his deposition which supported that Rockwood, Chapel, or Weller were released due to their support of CVEE. See Exhibit A, pgs. 121-124; See also Exhibit I, pgs. 181, 248 (Rockwood left due to receiving an offer from the Carlisle Hospital and Chapel was considered a "lightning rod" who refused to abide by his supervisor); Exhibit S.

Accordingly, Defendant Chambersburg Area School District is entitled to summary judgment because no facts of record exist which support any such deficient policies and/or customs existing at the School District.

V.   **CONCLUSION**

For the foregoing reasons Defendants respectfully request that this Honorable Court grant summary judgment in favor of all Defendants and dismiss all claims against all Defendants with prejudice because the evidence has unequivocally established that Plaintiffs' discharge did not violate a constitutionally protected right under the circumstances.

Respectfully submitted,

**FOWLER HIRTZEL MCNULTY & SPAULDING, LLP**

**BY**:

Dated: June 10, 2019

Gregory S. Hirtzel, Esquire
I.D. # 56027
1860 Charter Lane, Suite 201
Lancaster, PA 17601
Phone: (717) 553-2604
Fax: (717) 344-5560
Email: ghirtzel@fhmslaw.com

## CERTIFICATE OF SERVICE

I, Patricia L. Glasz, an employee of the law firm of Fowler, Hirtzel, McNulty & Spaulding, LLP certify that a true and correct copy of the foregoing document has been served upon the below individuals via e-filing as indicated on the date set forth below:

Mark B. Frost, Esquire
Mark B. Frost & Associates
1515 Market Street, Suite 1300
Philadelphia, PA 19102
*Attorneys for Plaintiffs*

**FOWLER HIRTZEL MCNULTY & SPAULDING, LLP**

**BY:** _Patricia L. Glasz_

Dated: June 10, 2019

Patricia L. Glasz, Pa.C.P.
Paralegal