## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BLACK & DAVISON, JAN G. SULCOVE, ESQUIRE, ROBERT C. SCHOLLAERT, ESQUIRE, ELLIOTT B. SULCOVE, ESQUIRE, JERROLD A. SULCOVE, ESQUIRE, MARK T. ORNDORF, ESQUIRE,

                Plaintiffs,

       v.

CHAMBERSBURG AREA SCHOOL DISTRICT, DANA BAKER, WILLIAM LENNARTZ, CARL BARTON, EDWARD NORCROSS, JOAN SMITH, ROBERT FLOYD, MARK SCHUR, KEVIN MINTZ, ALEXANDER SHARPE,

                Defendants.

**CIVIL ACTION**

**NO. 1:17-CV-00688-CCC**

**(BEFORE THE HONORABLE CHIEF JUDGE CHRISTOPHER C. CONNER)**

### DEFENDANTS' BRIEF IN REPLY TO PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, by and through their counsel, Fowler Hirtzel McNulty & Spaulding, LLP, respectfully submit, pursuant to Middle District Local Rule 7.7, this Brief in Reply and, in support thereof, aver as follows:

#### I.    <u>Introduction</u>

There is an extensive record in this case which establishes, as a matter of law, the conclusion that Plaintiffs do not have a valid cause of action under the facts and/or applicable law. Plaintiffs, in their Brief in Opposition, have endeavored to take sound bites from that record and spin that information in an effort to create inferences which, when examined against the light of the actual record, are baseless. As the court is aware, the factual record in the instant matter is

extensive and requires consideration of the prevailing political forces and personal relationships, and the interplay of same, in the few years leading up to the 2015 School Board election.

This is mainly done through the distillation of tens of thousands of documents reviewed and produced to Plaintiffs throughout the discovery process.  Accordingly, Defendants have endeavored to provide the Court with a fair and accurate summation of that factual record (which establishes why summary judgment is proper), while balancing that with the concern of needlessly inundating the Court.  When the entirety of this record is examined in context, it is abundantly clear that the claims in this case, while reflective of the division within the School District and the Board by time of the 2015 School Board election, has nothing to do with the First Amendment or the Rights afforded thereunder. Defendants decline to participate in the *ad hominem* arguments scattered throughout Plaintiffs' brief in opposition, but rather, desire to address a few select points that further evidence why their summary judgment must be granted.

## II.      Plaintiffs' Release from their Role as Solicitor

Initially, there is no evidence to create a factual question on whether Plaintiffs were released from their position as solicitor because of their political activities in the 2015 election. The four sitting board members at the time of the time of Plaintiffs' political activities who subsequently moved to terminate Plaintiffs' contract had long since been on record as wanting Plaintiffs removed as the School District's solicitor.  Mr. Jan Sulcove was well aware of that fact.  Indeed, there exists an eminently reasonable inference that he engaged in the activity of "political affiliation" in 2015 for the purpose of attempting to influence the Board's composition so that his firm could continue as the solicitor.

Put differently, the handwriting of change was on the wall and the Black & Davison firm mobilized to try to prevent it, unsuccessfully.  Now they sue under the guise that their

constitutional rights were violated.  Respectfully, against the strength of this record, if it is held that Plaintiffs have an actionable violation of constitutional rights claim, such a holding sets a precedent that whenever there is a split School Board and an upcoming election, all the solicitor needs to do to preserve his or her position is to actively and openly campaign for the losing side (e.g., the side which had been his or her supporters).

Plaintiffs' offer numerous arguments as to why they were "*terminated for their political activity*." <u>See</u> ECF 69, pg. 31.  However, Plaintiffs fail to connect the dots from the sound bites offered in support of their argument to show how that noise gives rise to a question of whether their contract was terminated because of their election activities, as opposed to the lack of confidence and desire for change held by Defendants, Baker, Norcross, Smith and Barton well before January 2015.

Plaintiffs cite multiple media quotes of board members "*disapproving*" of Plaintiffs' political activity and questioning whether such activity was "*unethical*." <u>See</u> ECF 69, pg. 31. Evidently, there was enough of a question in Plaintiffs' eyes on this subject to inspire them to obtain a legal opinion on the issue.  But more importantly, in addition to illustrating why qualified immunity for the individual Defendants would apply if this indeed were the reason behind their decision to terminate the contract, the Plaintiffs' reliance upon these "*quotes of concern*" illustrates how baseless the factual condition precedent to Plaintiffs' claims truly are.

Moreover, Plaintiff's reliance on the "*quotes of concern*" by certain board members in the newspaper (and upon the Miracle and Helman affidavits) is inapposite both by the timing of the quotes (well after Baker, Norcross, Smith and Barton formed a mindset that the District needed a different solicitor) and the uncontroverted testimony of each of the individual board members establishing every one of them had their own reasons for deciding that Plaintiffs' contract should

be terminated having nothing to do with Plaintiffs' election activities during the 2015 election. Further, one or more Defendants voicing disapproval of the School District's Solicitor's political campaigning and questioning whether the same was "ethical" does not in any way permit the conclusion in the face of this record, that the reason the contract was terminated was because of Plaintiffs' support of the CVEE group.

Similarly, Plaintiffs' reference to *"emails showing that the discussions to terminate Plaintiffs began as of May 28, 2015"* misstates the record and turns a blind eye to the vast email communications prior to 2015, including the 2014 RFP agenda vote, which evidence a desire and an attempt to remove Plaintiffs as solicitor long before their CVEE affiliation and campaign activity in the 2015 elections. See, e.g., Exhibit R & Exhibit B (at #6.05) to Defendants' Motion for Summary Judgment.  Additional pre-2015 email communications in the possession of Plaintiffs' counsel (and Plaintiffs) at all time material hereto and which evidence dissatisfaction with Plaintiffs before any political activity have been attached hereto as **Exhibit CC**.[1] See Exhibit CC; See also Candidate statements within Exhibit CC to the local newspaper wherein candidate Defendants discussed legal waste and dissatisfaction with same (despite Plaintiffs claiming this was "pretext").

Plaintiffs also futilely argue that their First Amendment claims are bolstered by Defendants introducing a political activity policy shortly after Plaintiffs release. See Plaintiffs' brief in opposition, pgs. 17, 27, 31.  What Plaintiffs fail to inform this Court is the fact that this policy was the reissuance of the District's previous policy, per recommendation of the Pennsylvania School Board Association.  The District's "old" political activity policy is attached

---

[1] For clarity purposes, exhibits to this Reply Brief have been labeled as a continuation of the exhibits within Defendant's Motion for Summary Judgment.  A revised exhibit table of contents has been filed in conjunction with this reply brief reflecting same.

to Plaintiffs' Brief as Exhibit 19.  The policy adopted by the post-election board in 2016 is attached to Plaintiffs' Brief as Exhibit 19.   There is no difference substantively between the two policies, yet Plaintiffs try to insinuate adoption of the "new" policy was somehow related to a scheme by the new Board.  The very contents of this policy was the PSBA's approved form.  See Exhibit 9" attached to Plaintiff's Brief.  As can be seen, the policy is "from PSBA" and was last updated by Adele Mixell, PSBA Policy Specialist.  Alleging that the reissuance of this form policy, upon recommendation of the PSBA, was for nefarious reasons which support Plaintiffs first amendment arguments is factually incorrect and misleading.  Baselessly relying on the adoption of this policy in an attempt to create issues of fact, however, is a microcosm of Plaintiffs' brief in opposition as a whole.

Plaintiffs' misguided effort to take sound bites from the record and spin that information in an effort to manufacture unsupported inferences (e.g., Plaintiffs' contention that the respective Defendants' reasons for voting to terminate Plaintiffs' contract are "pretext" to disguise that they were being terminated for their political activities) is further illustrated by their counsel's representation to the Court that Plaintiffs supported CVEE in January of 2014.[2]  Plaintiffs' Counsel was present for the multiple instances when Mr. Jan Sulcove testified that the formation, and his support of CVEE, began in 2015. See Exhibit A to Defendants' Motion for Summary Judgment, pg. 69. ("**Q.** When did CVEE become formed?  **A.** Well, that was formed sometime between January 1st of 2015 and – and February 13th, 2015."); Id., pg. 114 ("**Q.** So, you had told

---

[2] At Paragraph 5 of Plaintiffs' Counter Statement of Facts, Plaintiffs' counsel represents to the Court that Plaintiffs supported CVEE in January of 2014.  Admittedly, there is text in the deposition transcript referred to by counsel which transposes the year 2014 for 2015.  However, on the very same page Mr. Sulcove indicates his political activity began "the first of the year" of the election.  It is difficult to imagine Plaintiffs' Counsel not being aware that the election was in 2015 (see e.g., Plaintiff's Complaint, ECF 24, ¶¶ 28, 31, 35, 37) and not 2014.  Likewise, it is hard to believe counsel is not aware that Mr. Jan Sulcove established the CVEE Political Action Committee in 2015.  See Exhibit A to Defendant's Motion for Summary Judgment, pgs. 69-70 (Jan Sulcove's deposition testimony indicating that Plaintiffs formed the CVEE committee in 2015). Despite that the reference to 2014 on the transcript is an obvious error, Plaintiffs nonetheless attempt to present the same to the Court as if it were actual fact.

me this before, and I'm going to ask the same question because I've already forgotten.  I apologize.  The CVEE party was formally established when?  **A.**  I don't know when it was established.  **Q.** Okay.  It was in 2015?  **A.**  Well, that's – that's when I first learned about it.");  Id., pg. 335 ("**Q.**  Were you campaigning for the CVEE by March 2015?   **A.** It was sometime in the early part of 2015, I got involved.");  Id., pg. 340 ("**Q.** Had you – Had you formed CVEE Political Action Committee as of March 11, 2015?  **A.** No, I don't think it was that early.")

Mr. Sulcove's testimony is fatal to Plaintiffs' claims generally (see Section VII. infra.) and as against Defendants Baker, Norcross, Smith, and Barton specifically because they moved for and supported a Request for Proposal Resolution to replace the District's Solicitor in 2014, before Plaintiffs engaged in their political activities.  His testimony is also illustrative of the distortive liberties Plaintiffs' counsel took in their brief in an attempt to create issues of fact in the face of a record replete with undisputed evidence to the contrary.

### III.    Qualified Immunity

The primary facts relied upon by Plaintiffs to manufacture their claims against all of the Defendants are quotes from some of the individual Defendants to the local media questioning whether it was proper or ethical for the Solicitors to take such a public and active role in support of the side which opposed their election and who would be charged with the responsibility of representing the Board in the future.  See, e.g., Plaintiffs' brief in opposition, pgs. 7, 28, 31.  Notably, these comments prompted Plaintiff Jan Sulcove, an attorney with decades of experience, to make two separate ethics inquiries and commission an official opinion on the subject.  Likewise, Defendant Dr. Baker made separate inquiries about whether the conduct was ethical. Respectfully, these actions by the parties illustrate that if somehow a question of fact is found in the record, the Defendants to which that question pertains should nonetheless be entitled

to qualified immunity.  In short, how can Plaintiffs claim that their right to engage in unfettered political patronage (and therefore political affiliation was not an appropriate requirement of this solicitorship) was "clearly established" when they themselves felt compelled to seek an ethics opinion evaluating the same?  If the District's Solicitor, with decades of experience who obviously knew he had chosen in recent years to take one side of a split school board over the other, does not know whether his right to engage in the actions at issue is "clearly established," then how can the non-lawyer/non-solicitor defendants be expected to know this?  Moreover, from a layperson's perspective, the questions and comments presented in the media articles are quite natural and reasonable under the circumstances. Consequently, any Defendant against whom it is concluded there is a question of fact as to whether their decision to terminate Plaintiffs' contract was actionable, is entitled to qualified immunity.

## IV.   Dr. Padasak's Testimony

Plaintiffs quote at length in their brief the testimony of the District Superintendent, Dr. Joseph Padasak.  According to Plaintiff's Counsel, Dr. Padasak's testimony "cannot be understated." <u>See</u> Plaintiff's brief in opposition, pg. 24.  Not surprisingly, Plaintiffs failed to mention that Dr. Padasak was asked, point blank, why Plaintiffs were released from their role as solicitor and answered that it was because of the Dusman litigation:

> Q.  At the meeting where they were terminated, because I see that they were terminated the end of March, was a reason stated for the basis of the termination?
> A.  I don't recall what that reason was publicly.
> Q.  Do you know what the reason was privately?
> A.  Yes.

```
Q.  What was the reason?
A.  Board members were dissatisfied with the
Dusman lawsuit and blamed Jan or blamed
Sulcove -- blamed Black and Davison for it.
```

<u>See</u> Exhibit I to Defendants' Motion for Summary Judgment, pg. 136.  In theory, Plaintiffs are correct that Padasak's testimony cannot be overstated because, he himself supported CVEE and Jan Sulcove, yet still testified that Plaintiffs' discharge had nothing to do with Plaintiffs' 2015 election activities.

The fact that Dr. Padasak testified that he believed Plaintiffs' performance as solicitor was satisfactory has no substantive effect on this case.  It is the voting members of the Board who are charged with the right and responsibility to select the District's solicitor and it is imperative that they have confidence in that solicitor.  Further, while Dr. Padasak may have been satisfied with Plaintiffs' performance, it is important to keep in mind that it was not Dr. Padasak who was the target of Plaintiffs' agenda.  It was not Dr. Padasak whose was "put through hell" and belittled by Mr. Sulcove in executive sessions, as Defendant Joan Smith was. <u>See</u>, e.g., Exhibit V to Defendants' Motion for Summary Judgment, pg. 77.

It was not Dr. Padasak who was called a "dipshit" by Mr. Sulcove and said to be "ignorant" and "off of his medications" as Defendant Ed Norcross was. <u>See</u>, e.g., Exhibit K to Defendants' Motion for Summary Judgment. It was not Dr. Padasak who Mr. Sulcove called a "coward" to his supporters on the Board as Defendant Dana Baker was. <u>See</u> <u>id.</u>  It also was not Dr. Padasak whose family was accused by Mr. Sulcove of lying and fabricating evidence, or who was accused of defamation and the target of an attempt to disqualify his nomination after winning the primary election, as Defendant Alex Sharpe's was. <u>See</u> <u>id.</u>  The undisputed facts

remain that Defendants had obvious and real reasons for having no confidence in Plaintiffs and for wanting a new solicitor.

Additionally, in their brief, Plaintiffs state that *Dr. Padasak* prepared Exhibit 12 to Plaintiffs Brief in Opposition ("SELECTION OF A SOLICITOR 2015-2018 RELEVANT QUESTIONS AND ANSWERS"). Plaintiffs necessarily were aware that this statement was incorrect because the School District produced an email from Mr. Jan Sulcove to Dr. Padasak and other CVEE cohorts, dated May 23, 2015, wherein Mr. Sulcove attaches the very Q&A document Plaintiffs identify as Exhibit 12. In his email attaching the document, Mr. Sulcove states **"[a]ttached is a Q & A that I prepared for your use in connection with the interviews for Solicitor . . .".** The email and corresponding attachment are attached hereto as **Exhibit DD**. (Emphasis added). This email and attachment (which is identical to that which Plaintiff represents was prepared by Dr. Padasak) was also produced by separate letter to Plaintiffs' Counsel. Hence, like advising the court that Sulcove sided with the CVEE in 2014, Plaintiffs' counsels' reliance on Dr. Padasak's testimony with respect to the author of this document was obviously in error.

## V.    Plaintiffs' Policymaking & Politicization of the Solicitor Role

Defendants' argument as to why First Amendment protections do not apply (the Elrod/Branti exception) in the context of this solicitorship are well detailed within their Motion and corresponding Brief. In response, Plaintiffs attempt to downplay their role in making policy for the District and in politicizing the Solicitor position. The main way this was done was to imply that Plaintiffs' policymaking, drafting of censures, and communications about the RFP process were done exclusively at the direction of the board and that Plaintiffs had "no ability" to do those things themselves. See Plaintiff's Brief in Opposition, pgs. 26, 28. Since these things

were all allegedly done at the direction of the board/administration, Plaintiffs argue that political affiliation was not an appropriate requirement of this solicitorship and that they are therefore entitled to first amendment protections.

However, like the arguments addressed above, documents obtained and produced by the District apprised Plaintiffs' counsel that the aforementioned activities were not performed exclusively at the direction of the board/administration.  Rather, Plaintiffs' took an unprompted, active policy making role which establishes that the Elrod/Branti exception is applicable (assuming arguendo the court believes there is a question whether Plaintiff's were terminated because of their political activity).  Further documents available to Plaintiffs' Counsel evidencing this to clearly be the case are attached hereto as **Exhibit EE**.

First, Plaintiffs represent to the Court that the 2015 RFP communications "were done at the direction of the board and superintendent." See Plaintiffs brief in opposition, pg. 28.  However, Plaintiffs' RFP communications are rife with unprompted communications from Plaintiffs to their political allies resulting in manipulation of the politics and process. See Exhibit EE.  This illustrates Plaintiffs are clearly choosing sides among a divided Board - making "political" affiliation a necessary element of their job - and this in itself makes political affiliation a necessary element to the solicitor position.

Importantly, these are unsolicited communications by Mr. Jan Sulcove to his supporters (and to the exclusion of the minority board members who had long and openly opposed him continuing as solicitor).  These communications by Mr. Sulcove provide direction, instruction, and strategy to specific board members in an attempt to orchestrate the RFP process so that their preferred solicitor candidate (and Mr. Sulcove's preferred law firm), would be awarded an unprecedented three year contract that would bind the incoming board-elect to Black & Davison

as solicitor until the 2017 elections. <u>See</u> <u>Id.</u>  Respectfully, it does not get any more political than that.  This clearly illustrates how under Black & Davison's regime, at least in the couple years immediately leading up to the election which led to their termination, Plaintiffs intertwined solicitor duties and politics as one, thereby making affiliation a necessary requirement of the position. <u>See</u> Exhibit EE.

Plaintiffs, in their Brief in Opposition, attempt to sidestep the charge that they were taking sides and making policy with regard to Mr. Jan Sulcove's actions concerning censure of Baker, Norcross, and Smith by arguing the censures of these board members were only prepared by Mr. Sulcove because the Board majority/District leadership requested that it be done. <u>See</u> Plaintiffs' brief in opposition, pgs. 21, 28.  However, documents produced to Plaintiffs' Counsel readily debunk the suggestion that Mr. Sulcove was not inserting his personal preference, politics, and policy into the Board's consideration of whether these individuals should be censured. <u>See</u> Exhibit EE.  With regard to his communications concerning these censures, Mr. Sulcove stated:

- "**I would recommend** that [Ed Norcross] be censured for the use of this unacceptable tactic";

- **"I had hoped that the Board President would sign a letter of censure** [for Norcross & Baker], but she is vacillating";

- "Accordingly, **I am recommending** the following corrective action: . . . Private censure of Mr. Norcross and Dr. Baker"

- "Attached is a letter of censure [for Joan Smith] for your review and comment . . . **I would recommend this** as the next step in the corrective process."

<u>See</u> <u>Id.</u> (Emphasis added.)

Accordingly, the censure of these minority members of the divided Board (who also were in opposition to his being solicitor by this time) were executed upon the recommendation and suggestion of Mr. Sulcove, not the Board/administration.  Again, Plaintiffs and their counsel are well aware of these documents, in fact, they were authored by Mr. Sulcove's own hand.  As such, representing to the Court that political affiliation was not a requirement of this position because the censures were at the recommendation of others, at best, is factually incorrect.

Plaintiffs' contention that their actions constituting policymaking should have no effect on whether first amendment protections applied to this position is utterly contradicted, once again, by Plaintiffs own communications evidencing not only the depth to which they were involved in policymaking, but also, how they drafted policies specifically targeting the four individual defendants which comprised the minority of the split Board in 2014-15. See Exhibit T to Defendants' Motion for Summary Judgment.  Further, even though Plaintiffs claim that their policymaking was done solely at the request of the board/administration, much of their policymaking was done, not at the behest of administration, but at Plaintiffs' own suggestion.

This is clearly illustrated by a July 14, 2014, email and referenced attachment (which have been produced) from plaintiff Jan Sulcove entitled "Board Policy No. 002.1." See Exhibit EE, at 7/14/14 email and attachment. Notably, Mr. Sulcove states in this email to Dr. Padasak and Billy Hodge that "**[a]ttached for your review is the new policy that I would recommend the board approve**." See id. (emphasis added). Mr. Sulcove's policy addresses the requests for information and behavior of individual board members.   This policy is obviously structured and designed to marginalize the minority Board members by prohibiting their ability to take certain actions in the absence of approval from a majority of the board. This missive is yet another powerful example of the Solicitor's policymaking activities (and the dynamics occurring within

the District at this time). We have not quoted it in order to stay in compliance with local rules but urge the court to examine this particular Exhibit in detail. <u>See</u> Exhibit EE, Mr. Jan Sulcove's 7/14/14 email and the policy attached thereto.

Clearly, the solicitor by his actions and recommendations, made policy, influenced policy and through his influence over the majority of the divided board, implemented policy. Against the backdrop of any one of the examples referred to herein, let alone all of the examples collectively (which is itself only a sampling of the examples in the record of actions taken by Plaintiffs influencing and making District policy), there is no question but that the <u>Elrod</u>/<u>Branti</u> exception applies to Plaintiff's claims.

## VI.   <u>Expert John Freund</u>

The Affidavit from John E. Freund, III, Esquire, Defendant's expert in this matter who will testify at trial if necessary, was included in Defendants' Motion for Summary Judgment. <u>See</u> Exhibit Y. While Plaintiffs try to dismissively suggest that Mr. Freund's affidavit should be "ignored entirely," the Affidavit was submitted in conjunction with the Defendant's Motion for Summary Judgment, well within Defendants' expert report deadline of July 1, 2019. There is no surprise or prejudice associated with Defendant's use of and reliance upon Mr. Freund's affidavit here or his testimony at trial. In short, any arguments that Mr. Freund's unrebutted and perfectly legitimate expert affidavit should be "ignored entirely" is baseless.

Mr. Freund is the chair of the Education Law Practice Group at the law firm of King, Spry, Herman, Freund & Faul, LLC.  <u>Id</u>. ¶ 2.  He has more than 40 years of experience as solicitor for public School Boards, having held solicitorships in 22 public School Districts and having served two 4 year terms as a School Board member for a local public School District. <u>Id</u>., ¶¶ 3 & 8,  He is past President of the Pennsylvania School Board Solicitor's Association and for

the past 8 years, has been an adjunct professor of Education teaching School law and

negotiations to cohorts of Doctoral students at East Stroudsburg University.  Id., ¶¶ 7 & 10.

    Mr. Freund, in relying upon his opinions in this matter, has "given particular reliance on"

among other things, the decisions in "Ness v Marshall, 660 Fed.2d 517 (3d Cir. 1981), Elrod v

Burns, 427 U.S. 347 (1976) and other cases relevant to the first Amendment rights of public

employees and appointees." Id., ¶ 13.  He explains that Pennsylvania Courts have consistently

held that School Board Directors are not fiduciaries and accordingly, Solicitors are political

appointees.  Id., ¶ 15.  He also notes that "Pennsylvania School Boards as any other client are

entitled to legal counsel who will be loyal and provide zealous and competent representation"

and "[i]t is not uncommon for a newly elected School Board to appoint a new solicitor in whom

they believe will provide counsel and representation to support their particular policy agenda."

Id., ¶ 23.

    Indeed, "[c]ompatability with a majority of School Board members and their confidence

in the Solicitor's loyalty, zealousness and competence is essential to the ability of the Solicitor to

perform his/her job effectively." Id., ¶ 26. Mr. Freund notes that Plaintiffs, and Jan Sulcove in

particular, "became actively involved in the political and electoral process in openly supporting

candidates for School Board who were ultimately unable to achieve a Board majority.  Id., ¶ 28.

He also notes that "Jan Sulcove openly cast aspersions against individual School Board

members" who had "concerns about Black & Davison's handing of litigation advice and

excessive billing" that predated the seating of the new Board.  Id., ¶¶ 29 & 30.  As such, Mr.

Freund concludes that under this record, the Chambersburg Area School Board "had both the

right and performance based reason to replace Black & Davison as Solicitor." Id., ¶ 27. He also

opines, as borne out by Mr. Sulcove's work as the District's solicitor, that School Solicitors are

regularly involved in the development, writing and implementation of School Board policy.  Id.,

¶ 24.    Admittedly, Mr. Freund's opinions that the new Board was within its rights to terminate

Plaintiffs and to find a solicitor it had confidence in, given the strength of this record likely do

not come as a revelation.  Nor does his uncontroverted opinion that School Solicitors are

regularly involved in the development, writing and implementation of School Board policy come

as a surprise. In fact, such is completely supported by the record in this case. Accordingly, it is

respectfully submitted that the unrebutted opinions of this career long solicitor establish in itself

that the political appointee Plaintiffs did not have their constitutional rights violated when the

new Board terminated their contract.

## VII.    <u>Defendant Robert Floyd and Kevin Mintz</u>

Further illustrating the unviability of Plaintiffs' claims is that, by Plaintiffs' own

admission, Defendant Robert Floyd was a CVEE constituent. <u>See</u> Plaintiffs' Brief in Opposition,

pg. 4; <u>See also</u> Plaintiffs' Amended Complaint, ¶ 35.  Despite this, Plaintiffs claim that Mr.

Floyd, along with the other Defendants, decided to release Plaintiffs from the role of Solicitor as

retribution for politically supporting the very same regime that Robert Floyd himself supported

and was a member of.  Of course, such rationale makes little sense, but nonetheless serves as a

basis for which Plaintiffs attempt to support their first-amendment claims.  Insinuating that a

CVEE supporter voted to release Plaintiffs due to their support of CVEE is a paradigmatic

example of the illogical conjecture needed to establish issues of fact in the instant matter.

Moreover, there is literally nothing in the record to link by insinuation or otherwise, the

Plaintiff's political activities or affiliation with CVEE to the vote of the newly elected

Defendant, Kevin Mintz to terminate Plaintiffs' contract. <u>See</u>, e.g., Exhibit O to Defendant's

Motion for Summary Judgment, pgs. 27, 31, 41-42.   As made clear by his deposition testimony,

the motivation for Defendant Mintz to replace Plaintiffs was his desire to retain in house counsel to serve as the solicitor. Id., pgs. 21, 47-48, 51-52. Hence, the votes of either Defendant Mintz or Defendant Floyd, coupled with the votes of Defendants Baker, Norcross, Smith and Barton who wanted to replace Plaintiffs before their political/campaign activities in 2015, renders the motivation behind any other Board member's decision to terminate plaintiffs' contract irrelevant to the analysis of Plaintiffs' claim that their rights were violated because "the Board" terminated their contract for political reasons. There is no question that more than a majority of the Board terminated Plaintiffs' contract for reasons unrelated to political affiliation.

**VIII.** <u>**Conclusion**</u>

The record overwhelmingly establishes that there is an absence of any question of fact or law as to the validity of Plaintiffs' claims that their First Amendment rights were violated when the new board voted to terminate Plaintiffs contract with the District. A review of the records establishes that the arguments and "facts" which plaintiffs rely upon in an attempt to create issues of fact are erroneous. Accordingly, it is requested that Defendants' Motion for Summary Judgment be granted.

Respectfully submitted,

**FOWLER HIRTZEL MCNULTY &
SPAULDING, LLP**

**BY**:

Dated: July 24, 2019                    Gregory S. Hirtzel, Esquire
                                        I.D. # 56027
                                        1860 Charter Lane, Suite 201
                                        Lancaster, PA 17601
                                        Phone: (717) 553-2604
                                        Fax: (717) 344-5560
                                        Email: ghirtzel@fhmslaw.com

{W0952147.1}

<u>**CERTIFICATE OF SERVICE**</u>

I, Patricia L. Glasz, an employee of the law firm of Fowler, Hirtzel, McNulty & Spaulding, LLP certify that a true and correct copy of the foregoing document has been served upon the below individuals via e-filing as indicated on the date set forth below:

Mark B. Frost, Esquire
Mark B. Frost & Associates
1515 Market Street, Suite 1300
Philadelphia, PA 19102
<u>*Attorneys for Plaintiffs*</u>

**FOWLER HIRTZEL MCNULTY & SPAULDING, LLP**

**BY:**  *Patricia L. Glasz*

Dated: July 24, 2019                    Patricia L. Glasz, Pa.C.P.
                                                          Paralegal

{W0952147.1}