**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BLACK & DAVISON, *et al.*, | : | Civil No. 1:17-CV-00688 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CHAMBERSBURG AREA SCHOOL | : | |
| DISTRICT, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is Defendants' Chambersburg Area School District, Dana Baker, William Lennartz, Carl Barton, Edward Norcross, Joan Smith, Robert Floyd, Mark Schur, Kevin Mintz, and Alexander Sharpe (collectively "Defendants") motion for summary judgment, as well as four motions in limine. (Docs. 58, 62, 74, 75, 76.)  Because the court holds that Plaintiffs occupied a policymaking position as the Chambersburg Area School District Solicitor, they could rightfully be terminated for differing with the policy views of the School Board without running afoul of the First Amendment.  For this reason, as explained further herein, the court will grant Defendants' motion for summary judgment and deny the four motions in limine as moot.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff Black & Davison is a law firm located in Chambersburg, Pennsylvania, which consists of five equity partners: Plaintiffs Jan G. Sulcove ("Sulcove"), Robert C. Schollaert, Elliott B. Sulcove, Jerrold A. Sulcove, and Mark T. Orndorf (collectively "Plaintiffs").  (Doc. 70, p. 15.)[2]  Black & Davison served as District Solicitor for the Chambersburg Area School District ("the District") from approximately 1971 until 2016.  (*Id.*)  All partners except Plaintiff Schollaert performed solicitor duties for the District.  (*Id.*)  Until 2015, the District retained Black & Davison by means of the School Board (the "Board") passing a yearly resolution.  (Doc. 60, ¶ 3; Doc. 70, p. 15.)

That practice changed on March 25, 2015, when the Board voted to approve a Request for Solicitor Proposals ("RFP") from interested law firms.  (Doc. 60, ¶ 44.)  The RFP describes various duties, including advising the Board in various areas of law, such as school law matters; contract analysis and interpretation; representing the District during collective bargaining negotiations, at Board meetings on school law matters, and before various courts on tax matters; reviewing and drafting policies; and serving as spokesperson for the District on all

---

[1] The facts related in this section are undisputed, and are provided primarily for context.  While there are facts in dispute in this case, the material facts used to decide the dispositive threshold legal issues are undisputed.  Therefore, it is not necessary for the court to address the disputed facts.

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

legal matters requiring public comment.  (Doc. 58-33, pp. 2–3.)  Two firms responded to the RFP: Black & Davison and CGA.  (Doc. 69, p. 10.)  On May 27, 2015, upon a vote by the Board, Black & Davison entered into a three-year contract with the District to perform District Solicitor duties.  (Doc. 60, ¶ 7; Doc. 70, p. 15.)

The Board has nine elected voting members.  (Doc. 70, p. 142.)  The Superintendent of the District serves as a non-voting board member. (Doc. 70, p. 14.)  In 2015, five board seats were up for election.  (Doc. 70, p. 17.)  While the School Board is "technically non-partisan," candidates for these seats were running under two different Political Action Committees ("PACs").  (Doc. 60, ¶¶ 28–29; Doc. 70, p. 16.)  These two PACs are Citizens for Value and Excellence in Education ("CVEE") and Common $ense.   (Doc. 60, ¶ 28; Doc. 70, p. 16.)

Each of the individual Plaintiffs supported CVEE in some capacity by engaging in a variety of activities, including "donations, handing out campaign literature, taking constituents to the polls, hanging and/or posting political signs." (Doc. 70, p. 17; *see generally* Doc. 58-15.)  Specifically, among other activities, Sulcove created the CVEE PAC, attended public meetings where he expressed support for CVEE, and circulated nominating petitions for CVEE candidates. (Doc. 58-15.)  All individual Plaintiffs have admitted to similar campaign activities.  (Doc. 70, p. 17.)

The candidates supported by Common $ense swept the 2015 Board elections and therefore occupied a majority of the Board seats.  (Doc. 60, ¶ 47.)  On December 3, 2015, the new Board members took office.  (Doc. 70, p. 22.)  On March 23, 2016, the new Board voted to terminate Plaintiffs' contract.  (Doc. 60, ¶ 54; Doc. 70, p. 23.)

On April 17, 2017, Plaintiffs filed the instant lawsuit, alleging that the Board's termination decision violated their First Amendment rights to freedom of speech and association, and also alleging a breach of contract claim.  (Doc. 1.)  Defendants filed a motion to dismiss for failure to state a claim on June 6, 2017.  (Doc. 5.)  On March 30, 2018, United States District Judge Christopher C. Conner granted in part and denied in part Defendants' motion to dismiss and granted Plaintiffs leave to amend their complaint.  (Docs. 22–23.)  Specifically, Judge Conner granted Defendants' motion regarding the procedural due process claim against the District and individual Defendants and the due process claim and the First Amendment claim against the individual Defendants, and denied the motion regarding the First Amendment violation claim against the District.  (Doc. 23.)  The court dismissed the breach of contract claim, but allowed leave to amend to add a *quantum meruit* claim.  (*Id.*)

On April 18, 2018, Plaintiffs filed an amended complaint.  (Doc. 24.)  On May 5, 2018, Defendants again filed a motion to dismiss for failure to state a

claim, and added an argument that the individual Defendants are entitled to qualified immunity.  (Doc. 25.)  On January 24, 2019, Judge Conner granted in part and denied in part Defendants' motion to dismiss for failure to state a claim.  (Doc. 46, 47.)  Specifically, Judge Conner granted Defendants' motion to dismiss the *quantum meruit* claim.  (Doc. 46, 47.)  Defendants answered the amended complaint on February 13, 2019.  (Doc. 51.)

On June 10, 2019, Defendants filed a motion for summary judgment, a statement of material facts, and brief in support thereof.  (Doc. 58, 59, 60.)  On July 19, 2019, Plaintiffs filed a brief in opposition and a statement of facts accompanying their brief.  (Docs. 69, 70.)  On July 24, 2019, Defendants filed a reply brief.  (Doc. 71.)  The motion is now ripe for disposition.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.  Further, venue is appropriate under 28 U.S.C. § 1391.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for granting summary judgment.  Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to summary judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323

(1986).  A factual dispute is "material" if it might affect the outcome of the suit

under the applicable substantive law, and is "genuine" only if there is a sufficient

evidentiary basis that would allow a reasonable fact-finder to return a verdict for

the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When evaluating a motion for summary judgment, a court "must view the facts in

the light most favorable to the non-moving party" and draw all reasonable

inferences in favor of the same.  *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265,

267 (3d Cir. 2005).

    The moving party bears the initial burden of demonstrating the absence of a

disputed issue of material fact.  *See Celotex*, 477 U.S. at 324.  "Once the moving

party points to evidence demonstrating no issue of material fact exists, the non-

moving party has the duty to set forth specific facts showing that a genuine issue of

material fact exists and that a reasonable factfinder could rule in its favor."  *Azur v.

Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  The non-moving

party may not simply sit back and rest on the allegations in its complaint; instead,

it must "go beyond the pleadings and by [its] own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (internal quotations

6

omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

Summary judgment should be granted where a party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23.

"Such affirmative evidence – regardless of whether it is direct or circumstantial –

must amount to more than a scintilla, but may amount to less (in the evaluation of

the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v.

Borough of W. Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

## DISCUSSION

Plaintiffs' First Amendment claims are brought under 42 U.S.C. § 1983,

which permits a civil action for a violation of a plaintiff's constitutional rights.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

42 U.S.C. § 1983.

In their motion for summary judgment, Defendants set forth five arguments:

(1) Plaintiffs were not terminated as District Solicitor for impermissible reasons;

(2) Defendants are entitled to qualified immunity; (3) First Amendment

considerations do not apply to Plaintiffs' role as District Solicitor because they occupy a policymaking position; (4) Defendant Edward Norcross is entitled to summary judgment; and (5) the District did not develop or maintain constitutionally-deficient policies, subjecting them to liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).  (*See* Doc. 59.) In opposition, Plaintiffs argue that they are protected under the First Amendment because District Solicitor is not a policymaking position for which a political affiliation requirement is appropriate.  (Doc. 69, pp. 28–34.)  Moreover, Plaintiffs argue that they were terminated because of their political activities.  (Doc. 69, pp. 34–41.)  Plaintiffs further argue that Defendants are not entitled to qualified immunity.  (*Id.* at 41–43.)  Lastly, they argue that the District is liable under 42 U.S.C. § 1983.  (*Id.* at 44–45.)

Since Plaintiffs allege violations of their First Amendment right to freedom of speech and association, the court will first address whether the role of District Solicitor is a policymaking position that is exempt from these First Amendment protections.  As explained in the following sections, the court concludes that the role of District Solicitor for the Chambersburg Area School District is a policymaking position because the District Solicitor has meaningful input into the decision-making process of the Board for the District.  Therefore, the Board and District are entitled to have a solicitor who shares their policy views.  As a result,

Plaintiffs are not entitled to protection under the First Amendment.  Because the court concludes that there is no constitutional violation, Plaintiffs' *Monell* claim fails as well.  Accordingly, the court will grant Defendants' motion for summary judgment, and deny the pending motions in limine as moot.

### A. The Chambersburg Area School District Solicitor is a policymaking position that is not protected by the First Amendment

As a general rule, the United States Supreme Court prohibits the termination of employment based solely on an employee's political beliefs.  *Elrod v. Burns*, 427 U.S. 347, 360 (1976).  However, the Court created an exception for "policymaking" positions, reasoning that policymaking positions can be terminated based on political affiliation because it furthers the government's interest in a "representative government not be[ing] undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate."  *Id*. at 367.  The Court subsequently held that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  *Branti v. Finkel*, 445 U.S. 507, 518 (1980).

The Third Circuit has added contours to the *Elrod/Branti* test by stating that "should a difference in party affiliation be highly likely to cause an official to be

ineffective in carrying out the duties and responsibilities of the office, dismissals for that reason would not offend the First Amendment." *Ness v. Marshall*, 660 F.2d 517, 521 (3d Cir. 1981).  The Third Circuit has clarified that "the key factor seems to be not whether the employee was a supervisor or had a great deal of responsibility but whether the employee has 'meaningful input into decision making concerning the nature and scope" of a government program.  *Brown v. Trench*, 787 F.2d 167, 169 (3d Cir. 1986) (quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981)).  Further, *Elrod/Branti* claims can be disposed of at the summary judgment stage based on the threshold determination of whether the position in question is one of policymaking.  *See Ness*, 660 F.2d at 522 ("Where, as a matter of law, a person is determined to have occupied a policymaking position, that person's claims to protection from patronage dismissal under *Elrod* and *Branti* are disposable on a motion for summary judgment.").

Determining whether a position is a "policymaking" position is a fact-specific determination that requires an examination of "the nature of the responsibilities of the particular job at issue."  *Wetzel v. Tucker*, 139 F.3d 380, 383 (3d Cir. 1998).  Additionally, the inquiry should focus on "the function of the public office in question and not the actual past duties of the particular employee involved."  *Id.* (quoting *Brown*, 787 F.2d at 168).  In *Adams v. Governor of*

*Delaware*, the Third Circuit synthesized the criteria for examining the duties and functions of the position at issue under this analysis, stating:

> We consider "whether the employee has duties that are non-discretionary or non-technical, participates in discussions or other meetings, prepares budgets, possesses the authority to hire or fire other employees, has a high salary, retains power over others, and can speak in the name of policymakers." The "key factor" is whether an employee in that position "has meaningful input into decision making concerning the nature and scope of a major program."

922 F.3d 166, 178 (3d Cir. 2019).

Determining whether a position is "policymaking" fits into the larger framework of analyzing a claim of discrimination based on political patronage in violation of the First Amendment. In order to make out a *prima facie* case:

> [A plaintiff] must show that (1) she was employed at a public agency in a position that does not require political affiliation, (2) she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision.

*Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007). Thus, in order for Plaintiffs to make out a case for discrimination, they must show that their position did not require political affiliation.

While the parties argue this case under a political patronage discrimination framework, the court will also analyze the case under a freedom of speech analysis. *Curinga v. Cty. of Clairton*, 357 F.3d 305, 314 (2004). Accordingly, the court will first determine if the role of District Solicitor is a policymaking position and,

therefore, can be terminated for political reasons without running afoul of the First Amendment.  Then, the court will balance the interests of the government in running an efficient workplace and the interests of the employee in protecting their rights to freedom of speech.  *Id.* at 312.

## 1. The Chambersburg Area School District Solicitor is a Policymaking Position Under The *Elrod/Branti* Analysis

Defendants argue that the role of District Solicitor is a policymaking position because it consists of advising across a broad range of topics and drafting policies that implement the Board's agenda and vision for the District.  (Doc. 59, p. 39.)  Defendants cite to various emails that show Plaintiffs' role in drafting, editing, and advising the Board on confidentiality policies, communication policies, Code of Conduct policies, First Amendment considerations for the District, intellectual property issues for the District, and compliance with PIAA regulations.  (Doc. 59, p. 39.)  Defendants argue that relying on the District Solicitor for this type of activity gives them the right to have a solicitor who shares their views.  (*Id.* at 41.)

Defendants also argue that the Request for Proposals ("RFP") that delineates the duties of District Solicitor describes a "policymaking" position.  (Doc. 59, p. 40.)  The RFP lays out the specific duties of District Solicitor, including advising the Board in various areas of law including school law matters; contract analysis and interpretation; representing the District during collective bargaining

negotiations, at Board meetings on school law matters, and before various courts

on tax matters; reviewing and drafting policies; and serving as spokesperson for

the District on all legal matters requiring public comment.  (Doc. 59, p. 40.)

Finally, Defendants argue that political affiliation is a necessary requirement of the

District Solicitor position because Plaintiffs "politicized" their role by seeking to

undermine the majority's agenda and openly campaigning for the opposite

"political party."  (*Id.* at 41.)

Plaintiffs counter that political affiliation is not a requirement of the role of

District Solicitor based on statements from the District superintendent.  (Doc. 69,

p. 29–30.)  Additionally, Plaintiffs cite to a PowerPoint presentation from the

Pennsylvania School Board Association that is meant to educate school boards

about the possible role that solicitors can play.  (*Id.* at 25.)  Plaintiffs specifically

point to the portion of the presentation stating that the solicitor is "[o]bligated to

zealously represent the organization as lawfully directed by the board regardless of

whether the solicitor agrees with the views or ideas of the majority faction."  (Doc.

69-10, p. 9.)

Moreover, Plaintiffs argue that they did not make or enact the policies in

question, but merely advised the Board on the policies the Board devised.  (Doc.

69, p. 30.)  In Plaintiffs' view, the District Solicitor is not a "policymaking"

position since the solicitor cannot enact any policies.  Plaintiffs also cite testimony

from various Board members testifying that it is appropriate for Plaintiffs to engage in campaign activity under the First Amendment.  (*Id.* at 30–31.)  Finally, Plaintiffs argue that the issue of party affiliation is not relevant here since the School Board is non-partisan.  In Plaintiff's view, it follows that since the District Solicitor works for the Board, political affiliation alignment is not required for this position.  (*Id*. at 29.)  Finally, Plaintiffs reason that the position is not considered "policymaking" since Defendants did not cite political reasons for terminating Plaintiffs.  (*Id.* at 33.)

The court's inquiry starts with examining the statute that created the position or an otherwise relevant job description.  *Ness*, 660 F.2d at 521; *Waskovich v. Morgano*, 2 F.3d 1292, 1297–98 (3d Cir. 1993); *Zold v. Twp. of Mantua*, 935 F.3d 633, 640 (3d Cir. 1991).  Here, the court will look to the RFP because it is the best evidence available to the court detailing the District Solicitor job description.  The RFP describes various duties, including advising the Board in various areas of law, including on school law matters; contract analysis and interpretation; representing the District during collective bargaining negotiations, at Board meetings on school law matters, and before various courts on tax matters; reviewing and drafting of policies; and serving as spokesperson for the District on all legal matters requiring public comment.  (Doc. 58-33, p. 2–3.)

The court finds that the described District Solicitor duties are substantially similar to the duties discussed in several Third Circuit decisions in which solicitor positions were not protected by the First Amendment.  For example, in *Ness v. Marshall*, the Third Circuit held that the position of city solicitor is an appropriate position for a political affiliation requirement.  *Ness*, 660 F.2d at 522.  In *Ness*, the duties of city solicitor included "rendering legal opinions, drafting ordinances, negotiating contracts."  *Id.*  The court stated that these duties:

> define a position for which party affiliation is an appropriate requirement.  In relying on an attorney to perform these functions so intimately related to city policy, the mayor has the right to receive the complete cooperation and loyalty of a trusted adviser, and should not be expected to settle for less.

*Id.*

Additionally, in *Wetzel v. Tucker*, the Third Circuit focused on the role of advice from counsel in informing policy decisions, which is one of the duties of the District Solicitor here.  139 F.3d at 386.  The Third Circuit observed:

> Judgment is informed by experience and perspective, and any evaluation of the risks involved in such a decision (including the determination as to whether it is advisable to pursue litigation) is informed, in turn, by values.  Moreover . . . these issues are not purely legal; clients employ counsel to assess whether the goals are indeed worth the risks.  As such, to be confident in its Solicitor's advice on matters "intimately related" to Authority policy, the Board must have the right to demand that his loyalties lie with it and its agenda. Give the political ramifications of any attendant legal advice, confidence sometimes may come only with the assurance that the Solicitor shares the same political ideology as the Board.  These situations are exactly

the types for which the Supreme Court created the *Elrod/Branti* exception.

*Id*. (internal citation omitted).

The same considerations apply with respect to the advisory role of the District Solicitor in this case.  By comparison to the description of duties in these cases, the role of District Solicitor is easily categorized as a "policymaking" position.  The District Solicitor advises the Board on policy; drafts and edits the Board's policies; and represents the District in various negotiations and to the public; among other duties.  (*See* Doc. 58-33.)  In addition, looking at the factors cited by the Third Circuit in other cases involving the *Elrod/Branti* analysis, it remains obvious that the District Solicitor is a "policymaking" position.  The District Solicitor participates in policy discussions by providing legal counsel on said policies, and the District Solicitor can speak in the name of the Board.  Moreover, by providing legal counsel on a wide range of topics, the District Solicitor has meaningful input into decision making.  These are exactly the kinds of duties that require a solicitor to have the same views as the body making the policies because they are "so intimately related to . . . policy."  *Ness*, 660 F.2d at 522.  The District has the right to be represented by a solicitor who shares their views on these matters, or at least is not publicly opposed to their views on policy matters.  *See id.*

Plaintiffs' reliance on testimony from the District Superintendent stating that "political affiliation is not a requirement for the solicitor to do their job" is not dispositive for two reasons.  (Doc. 69, p. 29.)  First, this statement has no bearing on the heart of the inquiry which is "whether the employee has 'meaningful input into decision making concerning the nature and scope of a major . . . program." *Wetzel*, 139 F.3d at 386 (citing *Brown*, 787 F.2d at 169–70).  As explained above, the District Solicitor has direct involvement in advising the Board with respect to District policy.

Second, only statements by the *hiring authority* are significant in the determination of whether a position is one of policymaking.  *Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 398 (3d Cir. 1998); *Waskovich*, 2 F.3d at 1301–02; *Burkley v. Mun. Author. of Westmoreland Cty.*, No. 13-1014, 2015 WL 4901699, at *6 (W.D. Pa. Aug. 17, 2015).  Looking at the contract for services signed by Plaintiffs, Plaintiffs were not hired by the District Superintendent.  (Doc. 58-8, p. 5.)  Plaintiffs were hired by the Board, as evidenced by the signature of the Board President on the contract.  (*Id.*)  Additionally, the Board had to vote to terminate the District Solicitor, showing that the Board was the hiring authority. (Doc. 58-9, p. 6.)  For these reasons, the court finds that the statement by the District Superintendent that political affiliation is not necessary in the position of the District Solicitor is not dispositive.  And, this statement is insufficient to create a

genuine issue of material fact about whether the position is one that involves policymaking.

Plaintiffs also argue that the position does not require a political affiliation because Black & Davison performed this job for forty years under various school boards that held different policy views.  (Doc. 69, p. 30.)  However, the Third Circuit has held that the "inquiry should focus on 'the function of the public office in question and not the actual past duties of the particular employee.'"  *Wetzel*, 139 F.3d at 384.  Further, the court focuses on the job itself and not the specific duties or past actions of the employee.  "So long as applicable statutes, regulations and case law 'contemplate' that the public officer 'might' be relied upon to render legal advice implementing policy, the official is not protected by *Elrod* and *Branti*."  *Mummau*, 531 F. Supp. 402, 405 (E.D. Pa 1982), *aff'd*, 687 F.2d 9 (3d Cir. 1982).

Although the evidence cited by Plaintiffs does demonstrate that it was possible for Plaintiffs to serve as District Solicitor under school boards of different political affiliations, the question is whether the District Solicitor has "meaningful input into decision-making" and whether "difference in party affiliation will be highly likely to cause an official to be ineffective in carrying out the duties."  *Ness*, 660 F.2d at 521.  Since the role of District Solicitor has meaningful input into decision-making and a difference in policy views would color the advice given by the District Solicitor, it is a policymaking position.

Plaintiffs next argue that party affiliation is irrelevant because the Board is non-partisan. (Doc. 69, p. 29.) Although the Board is non-partisan, it is still an elected body. Therefore, the court concludes that the Board still has the right to have a policy advisor that shares their policy views. "Elected officials are charged with carrying forth the mandate of the voting public, and in order to effectuate the policies promised the electorate, that official must be able to have trusted advisors . . . who are directly accountable to that official." *Kaluczky v. City of White Plains*, 57 F.3d 202, 209 (2d Cir. 1995) (citing *Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir. 1993)); *Wetzel*, 139 F.3d at 385.

Finally, Plaintiffs argue that if the Board thought party affiliation was necessary for this position, they would have cited political reasons for the dismissal. (Doc. 69, p. 29.) The court does not agree that it logically follows that a termination must be based on political reasons in order to prove that political affiliation is necessary for the position. But Plaintiffs' argument is, in any event, beside the point. The inquiry conducted by the court is whether the position has meaningful input into decision-making such that political affiliation may cause the official to be ineffective in carrying out their role.

The court answers this inquiry in this case by holding that the position of District Solicitor for the Chambersburg Area School District is a policymaking position. Therefore, Plaintiffs do not meet the first prong of proving a *prima facie*

case for discrimination under the First Amendment, which is showing that they were employed at a public agency position that does not require a political affiliation. *Galli*, 490 F.3d at 271. Since Plaintiffs' position is one for which a political affiliation is required and therefore, one for which they can rightly be terminated for their political affiliation, Defendants' motion for summary judgment will be granted as to Count I of Plaintiffs' amended complaint.

### 2. *Pickering* analysis

While neither party addresses this framework, the court also analyzes this matter as a violation of freedom of speech under *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*. The Third Circuit has held that "where a confidential or policy making employee engages in speech or conduct against his public employer, the better analytical approach is found under the freedom of speech doctrine." *Curinga v. Cty. of Clairton*, 357 F.3d 305, 309 (3d Cir. 2004). As indicated, the court has concluded that the District Solicitor is a policymaking position.

*Pickering* analysis seeks to balance the employee's interest in their right to freedom of speech regarding matters of public concern under the First Amendment with the government's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. Of Twp. High School Dist. 205, Will Cty, Ill.*, 391 U.S. 563, 568 (1968). The test asks, "whether the

statement impairs discipline by superiors or harmony among co-workers, has a

detrimental impact on close working relationships for which personal loyalty and

confidence are necessary, or impedes the performance of the speaker's duties or

interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483

U.S. 378, 388 (1987).  For a successful claim under a *Pickering* retaliation claim:

> the employee must demonstrate that the speech involves a matter of
> public concern and the employee's interest in the speech outweighs the
> government employer's countervailing interest in providing efficient
> and effective services to the public.  Next, the speech must have been a
> substantial or motivating factor in the alleged action.  Finally, the
> employer can show that it would have taken adverse action even if the
> employee had not engaged in protected conduct.  The second and third
> factors are questions of fact, while the first is a question of law.

*Curinga*, 357 F.3d at 310 (internal citations omitted).

While neither party addresses the *Pickering* analysis, the amended complaint

arguably pleads a First Amendment retaliation claim.  Thus, the court will also

apply this test to the facts provided.  First, Plaintiffs must demonstrate that their

speech involved a matter of public concern, and that their interest in the speech

outweighs the Board's interest in efficiency in conducting their business.  *Id*. at

312; *see also Connick v. Myers*, 461 US 138, 147–48 (1983) ("Whether an

employee's speech addresses a matter of public concern must be determined by the

content, form, and context of a given statement, as revealed by the whole record.").

"[C]ampaigning for a political candidate relates to a matter of public concern."

*Curinga*, 357 F.3d at 313 (citing *Brady v. Fort Bend Cty.*, 145 F.3d 691, 706–07 (5th Cir. 1998)).

Here, the public speech at issue was campaigning for the CVEE ticket.  It is admitted by Plaintiffs that they engaged in a variety of activities supporting CVEE, including "donations, handing out campaign literature, taking constituents to the polls, hanging and/or posting political."  (Doc. 69, p. 9; *see generally* Doc. 58-15.) Specifically, Sulcove created the CVEE PAC, attended public meetings where he expressed support for CVEE, and circulated nominating petitions for CVEE candidates, among other activities.  (Doc. 69, p. 9.)  Other Plaintiffs have admitted to similar activities.  (*Id.*)  Therefore, Plaintiffs' speech involved a matter of public concern.

Next, Plaintiffs must demonstrate that their interest in the speech outweighs the government's "legitimate purpose in 'promoting efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service.'"  *Connick*, 461 U.S. at 150–51 (citing *Ex Parte Curtis*, 106 U.S. 371, 371 (1882)).  Factors to consider in this balancing test include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with

the regular operations of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

As we found in the *Elrod/Branti* analysis, the Board has an interest in having a solicitor that shares its specific policy views so that they can maintain efficient functioning of the Board.  Moreover, "neither the Constitution nor the *Pickering* balancing test requires a public employer to entrust an adversary or critic with a sensitive, confidential or policy role." *Kaluczky v. Cty. of White Plains*, 57 F.3d 202, 210 (2d Cir. 1995).  The relationship between District Solicitor and District is one that requires a close-working and confidential relationship, shown by the policymaking duties assigned to District Solicitor.  (Doc. 58-25.)  Therefore, the Board has a strong interest in having a trusted relationship with the District Solicitor to enable the Board to efficiently perform their public duties.

Since the court concludes that the employer's interest in maintaining an efficient workplace outweighs Plaintiffs' First Amendment interest, the court finds that there was no violation of Plaintiffs' First Amendment right to freedom of speech and their termination was not retaliatory.

In sum, Plaintiffs' position as District Solicitor is a policymaking role that precludes First Amendment protection from applying to the Board's termination decision.  Moreover, the Board's interest in maintaining a trusted relationship with the District Solicitor in order to efficiently fulfill its duties outweighs the District

Solicitor's interest in freedom of speech and association in this case. Therefore, Defendants' motion for summary judgment will be granted as to Count I.

### B. *Monell* claim

Count II of the amended complaint alleges a violation of Plaintiffs' First Amendment rights through the policies or customs of the Chambersburg Area School District. (Doc. 24, p. 14.) "A municipality is liable under § 1983 when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation." *Colburn v. Upper Darby Twp*., 946 F.2d 1017, 1027 (3d Cir. 1991). "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978).

Since the court found that there was no constitutional violation as a result of the Board terminating Plaintiffs as District Solicitor for the reasons already explained, Defendants' motion for summary judgment on Count II will be granted.

### C. Motions in Limine

There are four pending motions in limine in this case. (Docs. 62, 74, 75, 76.) Because the evidence at issue in these motions was not relied upon in deciding Defendants' motion for summary judgment, and because this case will not proceed

to trial in light of this ruling, the court will deny the four motions in limine as moot.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment will be granted.  (Doc. 58.)  Furthermore, the four motions in limine will be denied as moot.  (Docs. 62, 74, 75, 76.)  An appropriate order will issue.


s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated:  July 13, 2020